**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **GLOBAL OIL & GAS TEXAS, LLC** | ) | |
| **and** | ) | |
| | ) | |
| **GLOBAL OIL & GAS FIELDS** | ) | CASE NO.: |
| **OKLAHOMA, LLC,** | ) | |
| | ) | JUDGE _____ |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **BERNARD TUBEILEH**, an individual, | ) | |
| | ) | |
| | ) | |
| **SINOSTAR INVESTMENTS LLC**, an | ) | JURY TRIAL DEMANDED |
| Oklahoma limited liability company, | ) | |
| | ) | |
| | ) | |
| **JAMALABOX LLC**, an Oklahoma limited | ) | |
| liability company, | ) | |
| | ) | |
| **JOHN BARNETT**, an individual, | ) | |
| | ) | |
| **DR. DETLEF MADER**, an individual, | ) | |
| | ) | |
| **BLACKHORN GROUP, LLC**, a Missouri | ) | |
| limited liability company, | ) | |
| | ) | |
| **BLACKHORN USA, LLC**, a Missouri | ) | |
| limited liability company, | ) | |
| | ) | |
| **WILLIAM (aka "BILLY")** | ) | |
| **HUDDLESTON, JR.**, an individual, | ) | |
| | ) | |
| **LOUISIANA OFFSHORE** | ) | |
| **EXPLORATION, LLC**, a Louisiana limited | ) | |
| liability company, | ) | |
| | ) | |

**BDHL, LLC**, a Texas limited liability
company,

**CA PORTFOLIO MANAGEMENT, INC.,**
an Illinois corporation,

**CA FUNDS GROUP, INC. N/K/A
MINDFUL MEALS, INC.**, an Illinois
corporation,

and

**CHRIS CHRISTENSON**, an individual,

     *Defendants.*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## **COMPLAINT**

Now come Plaintiffs Global Oil and Gas Texas, LLC ("Global Texas") and Global Oil and Gas Fields Oklahoma, LLC ("Global Oklahoma") (together the "Global U.S. Subsidiaries"), through their counsel, and for their Complaint and Jury Demand, state:

## **INTRODUCTION**

1. Global Oklahoma and Global Texas, twin investment companies, were formed to invest in the lucrative U.S. oil and gas market. Bernard Tubeileh, a German national, was appointed to manage and oversee the Global U.S. Subsidiaries' operations. Rather than work to benefit the companies he managed, Tubeileh used his position to defraud Global Oklahoma and Global Texas at every turn. He—and others—stole funds disguised as consulting fees and laundered that money to his limited liability company, covertly reassigned the Global U.S. Subsidiaries' oil and gas rights to himself and others, enriched himself through fraudulent commissions and undisclosed self-dealing transactions, and funneled money and assets to his friends along the way. His schemes, discussed more below, went undiscovered for years.

2.     Bernard Tubeileh ("Tubeileh"), supported by a cadre of co-conspirators, controlled a quasi-criminal enterprise that, through a complex web of mail fraud, wire fraud, bribery, and money laundering, fraudulently diverted millions of dollars and oil and gas interests from the Global U.S. Subsidiaries to enrich himself, his family, and his co-conspirators. Tubeileh's schemes span the United States, involve millions of dollars and thousands of oil, gas, and mineral assets, and implicate everyone from fraudsters and oil well operators, to corporate executives, attorneys, and accountants. Each played a specific role in allowing Tubeileh and others to reap millions in benefits at the expense of the Global U.S. Subsidiaries.

3.     Through a pattern of Racketeer Influenced and Corrupt Organizations ("RICO") predicate acts of bank fraud, mail fraud, wire fraud, money laundering, the use of fraudulently obtained funds, fraud related to bankruptcy proceedings, and fraud upon the United States Citizenship and Immigration Services, Tubeileh caused millions of dollars in damages to Global Oklahoma and Global Texas, which are sister corporate enterprises.

4.     Tubeileh used his position within the two Global U.S. Subsidiaries, along with his control of two domestic shell companies—Sinostar Investments LLC ("Sinostar") (and its German parent company, Sinostar Investments GmbH, which Tubeileh owned in full) and Jamalabox LLC ("Jamalabox")—to unlawfully carry out various RICO predicate acts as part of his overall RICO conspiracy, with others known and unknown, to corruptly operate the Global U.S. Subsidiaries primarily for the financial benefit of everyone except the Global U.S. Subsidiaries.

5.     Starting in 2017, Tubeileh, as the Head of U.S. Operations for Global Oil & Gas AG ("Global AG"), was the Manager of the Global U.S. Subsidiaries. In this role, Tubeileh exercised day-to-day managerial control and served as a trusted advisor to the Global U.S. Subsidiaries on potential oil, gas, and mineral investments in the United States.

6.     Tubeileh decided, with others, to use his position to act as the hub of various spokes of fraudulent and illegal schemes. The Global U.S. Subsidiaries have identified multiple transactions corrupted by Tubeileh and his co-conspirators. The result? Nearly $100 million in total losses from investments riddled with fraud that served only the interests of Tubeileh and his co-conspirators.

7.     As part of Tubeileh's illegal schemes to enrich himself and others at the expense of the Global U.S. Subsidiaries, Tubeileh worked hand in glove with Global AG's CEO, Defendant Detlef Mader ("Mader"), who assisted Tubeileh with and profited from Tubeileh's various fraudulent schemes.

8.     Tubeileh corrupted Mader, and the two worked together to appoint Mader to sham positions within the Global U.S. Subsidiaries, paid him unjustified salaries for his service in these roles, enticed him with the prospect of special bonuses, and diverted fees to Mader to further corrupt the Global Texas and Global Oklahoma enterprises.[1] In return, Mader removed, ignored, and deactivated any and all corporate control mechanisms that would have otherwise hampered Tubeileh's various schemes.

9.     Tubeileh, who came to the United States without any oil and gas industry contacts, worked with William "Billy" Huddleston, Jr. ("Huddleston")—who has previously committed fraud—in a variety of oil and gas transactions. Tubeileh and Huddleston siphoned funds from the Global U.S. Subsidiaries and transferred them to Huddleston directly or, at times, funneled funds through several third-party companies so Huddleston could avoid a bankruptcy trustee and nondischargeable debts. *See In re Huddleston*, No. 3:17-cv-1964-K, 2018 WL 1182902 (N.D. Tex. Mar. 6, 2018) (affirming the bankruptcy court's order granting Final Judgment for creditor in

---

[1]     The ongoing investigation by Global Texas, Global Oklahoma, and Global AG into Tubeileh's misconduct has also revealed that Mader has misappropriated Global assets for personal use.

adversary proceeding and noting that rather than pay creditors, Huddleston "transferred the money … to his personal accounts" and "gambled away the money or spent it on personal items"); *see also In re Huddleston*, Civ. Action No. 16-31488-sgj-7, 2017 WL 1207522, at *14 (Bankr. N.D. Tex. Mar. 31, 2017) (finding Huddleston "perpetuated a fraudulent scheme by transferring investor funds from [his company] to himself and spending them on personal expenses with the intent of defrauding [creditor]"). Tubeileh and Huddleston conspired to enrich themselves and each other through the various schemes discussed below. At the same time, Tubeileh and Huddleston, with the help of others, facilitated Huddleston's evading of a bankruptcy judgment and various creditors.

10.     Tubeileh also conspired with John Barnett ("Barnett") to operate two companies—Sinostar and Jamalabox—through which Tubeileh and Barnett defrauded the Global U.S. Subsidiaries through huge sham fees and fraudulent loans. Barnett signed off on the documents that allowed Tubeileh and Barnett to not only move fraudulently obtained funds between Jamalabox and Sinostar, but to use the two companies to enrich themselves and further the various schemes discussed below.

11.     In addition, Tubeileh worked with numerous other individuals and entities across the country to improperly profit at the expense of the Global U.S. Subsidiaries. These include Defendants Wheat, Blackhorn USA, Blackhorn Group, and others yet unknown to the Global U.S. Subsidiaries. Among other things, these individuals and entities prevented the Global U.S. Subsidiaries from understanding the full scope and extent of Tubeileh's various schemes all while enriching themselves.

12.     Tubeileh's unlawful schemes, which form the basis for over 150 RICO predicate acts, included:

a. **The Sham Advisory Fee Scheme**: inserting himself, Sinostar, Jamalabox, and other associates as middlemen in transactions involving the Global U.S. Subsidiaries and third parties to self-deal and profit from the transactions at the Global U.S. Subsidiaries' expense for services not rendered, *see infra* ¶¶ 54–148;

b. **The Self-Dealing Loan Scheme**: arranging for the Global U.S. Subsidiaries to take out loans at exorbitant interest rates from entities controlled by Tubeileh (including Sinostar) without disclosing the inherent conflicts of interest created by these transactions.  Far worse yet, the loans to the Global U.S. Subsidiaries were made with funds stolen or diverted from the Global U.S. Subsidiaries, *see infra* ¶¶ 149–227;

c. **The Commissions Scheme**: disguising commission payments to himself and others that were in fact paid by the Global U.S. Subsidiaries, *see infra* ¶¶ 228–248;

d. **The Overriding Royalty Scheme**: purporting to sell fictional oil rights back to the Global U.S. Subsidiaries, *see infra* ¶¶ 249–309; and

e. **The Carried Working Interest Scheme**: fraudulently or improperly assigning rights in the Global U.S. Subsidiaries' investments to himself and Huddleston, among others, *see infra* ¶¶ 249–68, 310–26;

13.     Through these schemes and others, Tubeileh ran the Global U.S. Subsidiaries to personally enrich himself and others by fraudulently diverting money and oil and gas interests from the Global U.S. Subsidiaries. As a direct result of Tubeileh's racketeering activities, the Global U.S. Subsidiaries lost millions of dollars every year of Tubeileh's management,

accumulating operating losses of over $14 million, approximately $120 million in outstanding debt, and a negative net asset value.

14.     Conversely, by the end of Spring 2023, Huddleston—who owes or owed a $2 million federal judgment for fraud and misappropriation of investor funds in a different case—and his alter ego companies had reaped millions of dollars in illicit commissions and were given, by Tubeileh, significant oil and gas interests that otherwise rightfully belonged to the Global U.S. Subsidiaries for no reason. Others, including Wheat and Blackhorn enjoyed millions of dollars in baseless profits; and others were granted many oil and gas rights, without consideration, that rightfully belonged to the Global U.S. Subsidiaries.

15.     As for Tubeileh, at the time he "resigned" from his roles with the Global U.S. Subsidiaries—using the money misappropriated from the Global U.S. Subsidiaries and funneled through Jamalabox and Sinostar—had purchased a million-dollar home, a 2023 Porsche SUV, traveled extensively throughout Europe with his family, footed the bill for private tuition for his child's school, and held approximately 700 stolen or fraudulently acquired—in part with stolen money—oil and gas interests on behalf of himself and Sinostar and/or Jamalabox.

16.     Tubeileh and his cohorts have damaged the integrity and respectability of the United States oil and gas investment industry. Their acts reinforce the concern that foreign investors should not trust the integrity of players in the domestic oil and gas exploration market. Punishment in this case is one way the United States oil and gas market can demonstrate to foreign investors that fraudulent self-dealing will not be tolerated and that organized crime in the United States is vigorously policed.

## PARTIES

17.     Global Oil & Gas Texas, LLC, is a limited liability company whose only member is Global Oil & Gas AG, a company organized under German law. Global Texas is an oil and gas investment company operating in the United States.

18.     Global Oil & Gas Fields Oklahoma, LLC, is a limited liability company whose only member is Global Oil & Gas AG, a company organized under German law. Global Oklahoma is an oil and gas investment company operating in the United States.

19.     Defendant Bernard Tubeileh is a German foreign national and permanent resident of the United States who resides in Texas. Tubeileh sits at the center of multiple fraudulent schemes. On information and belief, Tubeileh is the sole member of Sinostar Investments GmbH ("Sinostar GmbH").

20.     Defendant Sinostar Investments LLC is or was a limited liability company whose only member, on information and belief, is Sinostar GmbH, a German company, which is wholly owned and managed by Tubeileh. Sinostar is controlled by Tubeileh through Sinostar GmbH. Based on records filed with the Oklahoma Secretary of State's office, Sinostar's business address in Oklahoma is 502 South Locust Street, Skiatook, Oklahoma 74070. Sinostar is registered to do business in Texas, and its filings with the Texas Comptroller of Public Accounts indicate its Texas address is 400 Southridge Lakes Parkway, Southlake, Texas 76092, which is Tubeileh's private residence.

21.     Defendant Jamalabox LLC is a limited liability company whose only member(s), on information and belief, are Tubeileh, Sinostar, and/or Sinostar GmbH. Jamalabox is an inactive Oklahoma limited liability company formed in January 2016. Based on records filed with the Oklahoma Secretary of State's office, Jamalabox's business address is 502 South Locust Street, Skiatook, Oklahoma 74070, which is the same as Sinostar LLC's business address.

22.     Defendant John Barnett is, on information and belief, a resident and citizen of Oklahoma. He was also, at various times, a nominal manager of Sinostar and Jamalabox, both of which appear to be operated out of Mr. Barnett's home. At all relevant times, Barnett conducted business in Texas.

23.     Defendant Dr. Detlef Mader is a foreign national and German citizen. Mader was the Chief Executive Officer of Global AG from 2016 until September 29, 2023. At all relevant times, Mader conducted business with Tubeileh in the United States.

24.     Defendant William "Billy" Huddleston, Jr. ("Huddleston") is, on information and belief, a citizen and resident of Louisiana.

25.     Defendant Louisiana Offshore Exploration, LLC ("Louisiana Offshore")[2] is a limited liability company whose only member, on information and belief, is Huddleston. Louisiana Offshore's business address on file with the Louisiana Secretary of State is 12222 Merit Drive, Suite 120, Dallas, Texas 75251. Louisiana Offshore is merely an alter ego of Huddleston.

26.     Defendant BDHL, LLC ("BDHL") is a Texas limited liability company whose only member, on information and belief, is Huddleston. BDHL is merely an alter ego of Huddleston.

27.     Defendant CA Portfolio Management, Inc. ("CA Portfolio Management") is an Illinois corporation headquartered in Illinois.

28.     Defendant CA Funds Group, Inc., n/k/a Mindful Meals, Inc., ("CA Funds Group") is an Illinois corporation headquartered in Illinois.

---

[2] Louisiana Offshore is also a defendant in pending litigation in the United States District Court for the Northern District of West Virginia, based on allegations that an initial transfer of mineral interests in which Huddleston was involved was effectuated through the forgery of a deceased woman's signature. *See M&M Land Consulting, LLC v. Lorentz*, No. 1:23-cv-54-TSK (N.D.W. Va.) (filed June 21, 2023). Global Oklahoma is also a defendant in that case.

29.     Defendant Blackhorn Group, LLC ("Blackhorn Group") is a Missouri limited liability company whose only member is Logan Wheat. At all relevant times, Blackhorn Group conducted business in Texas.

30.     Defendant Blackhorn USA, LLC ("Blackhorn USA") is a Missouri limited liability company whose only member, on information and belief, is Blackhorn Group. At all relevant times Blackhorn USA conducted business in Texas.

31.     Defendant Chris Christenson is, on information and belief, a citizen and resident of the State of Michigan.

## JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction under Title 28, United States Code Section 1331 because Plaintiffs' civil RICO claims (Counts I through 8) arise under federal law and the predicate acts discussed below affected interstate and international commerce.

33.     This Court has supplemental jurisdiction over the state-law claims (Causes of Action 9 through 12) under Title 28, United States Code Section 1367(a) because they are "so related" to the federal claims that they form part of the same "Cases" and "Controversies" under Article III.

34.     Venue in this District and Division is proper under Title 18, United States Code Section 1965 and Title 28, United States Code Section 1391(b)(2), as a substantial part of the events alleged occurred in this judicial district or under Title 28, United States Code Section 1391(b)(3), because Tubeileh is subject to personal jurisdiction in this District and Division.

35.     This Court has personal jurisdiction over Tubeileh because he is a foreign national and permanent resident of the United States living in this District. 18 U.S.C. § 1965(a). This Court has personal jurisdiction over all other RICO Defendants who reside in, are found in, or transacted affairs in this District. *Id.*

36.     This Court has personal jurisdiction over other RICO Defendants not found in this District or that did not transact affairs in this District because the ends of justice require they be brought before this Court. 18 U.S.C. §§ 1965(b), (d).

37.     This Court also has personal jurisdiction over the non-RICO Defendants (Blackhorn Group, LLC, Blackhorn USA, LLC and Chris Christenson) because their individual actions satisfy both the Texas long-arm statute, Tex. Civ. Prac. & Rem. Code § 17.042(1)–(2), and the Due Process requirements of the Fourteenth Amendment to the United States Constitution.

## FACTUAL ALLEGATIONS

### THE ENTERPRISE

38.     The Global U.S. Subsidiaries, Global Texas and Global Oklahoma, have been fleeced of more than $20 million because of the fraudulent and criminal schemes orchestrated by Tubeileh and in which the following other RICO Defendants were involved: (1) Sinostar, (2) Jamalabox, (3) Mader, (4) Barnett, (5) Huddleston and his alter-ego companies Louisiana Offshore and BDHL, (6) CA Portfolio Management, and (7) CA Funds Group.

39.     Global Texas is an "enterprise" as that term is defined in Title 18, United States Code Section 1961(4).

40.     Global Oklahoma is an "enterprise" as that term is defined in Title 18, United States Code Section 1961(4).

41.     Global Texas and Global Oklahoma, as sister companies, have a unity of ownership by Global AG and were both managed by Tubeileh through the pattern of racketeering activities detailed below. The combination of Global Texas and Global Oklahoma is also an enterprise ("Global Enterprise") that is "associated in fact" under Title 18, United States Code Section 1961(4).

11

**TUBEILEH CORRUPTS MADER**

42.     On April 14, 2021, Tubeileh proposed to Mader that Mader be appointed "president" of the Global U.S. Subsidiaries, which Tubeileh framed as a promotion for Mader. Tubeileh described the new role as one where Mader would have a more official role in improving the structure of the Global U.S. Subsidiaries, but that the transactions in which they were engaging would continue as they had in the past.

43.     In exchange for this new role, which Mader understood would allow him to continue approving Tubeileh's investments on behalf of the Global U.S. Subsidiaries, Tubeileh determined it would be reasonable to pay Mader $10,000 per year for each subsidiary (there were three at the time), on top of the salary Mader earned from Global AG as its CEO.

44.     Tubeileh's proposal on Mader's additional salary as president of the Global U.S. Subsidiaries was made after Mader begged Tubeileh on numerous occasions, including between April 10, 2021, and April 14, 2021, to pay him a bonus in exchange for Mader's continuing to approve the investments and assignments Tubeileh was bringing about through his various schemes. Tubeileh saw Mader's financial insecurity as a weakness he could exploit.

45.     As an example of this give-and-take relationship between Tubeileh and Mader, on May 16, 2022, Mader emailed Tubeileh and stated that, unlike other Global U.S. Subsidiaries employees, he had not received a team bonus for closing projects and he would like to receive a $30,000 bonus for closing deals which directly benefitted Tubeileh personally and furthered the various schemes. (**Exhibit 1**, 5/16/2022 Email, Tubeileh and Mader.)

46.     In exchange for the requested $30,000 bonus, Mader promised to continue making what he described as "**quick and courageous**" decisions to enable Tubeileh to continue generating "commissions" and paying bonuses to other Global U.S. Subsidiaries employees, as well as to Mader, without the knowledge of the parent company, Global AG. The decisions were "quick" in

that there was no due diligence, and they were "courageous" in that they were never disclosed to the parent company in Germany, a foundation for fraud. (*See* **Ex. 1**.)

47.     To assure Tubeileh of his continued loyalty, Mader represented to Tubeileh that in Mader's role as president of the Global U.S. Subsidiaries, Mader could continue to approve future transactions to perpetuate Tubeileh's various schemes without providing information to or obtaining permission from Global AG's Supervisory Board. Mader confirmed he would continue acting on the guiding principle that the fewer people who know about something, the better. (*See* **Ex. 1**.)

48.     For example, in August 2022, Tubeileh and Mader agreed to withhold information from Global AG's controlling shareholder and the Global U.S. Subsidiaries' main lender unless he signed a confidentiality agreement. Tubeileh and Mader also agreed not to share information with Global AG's Supervisory Board for fear that it would get back to the Global U.S. Subsidiaries' main lender. (**Exhibit 2**, 8/26/2022 Email, Tubeileh and Mader.)

49.     In addition, Tubeileh ensured other Global U.S. Subsidiary employees—including its operations manager, Lori Land—would not provide information to the lender. To do so, in addition to her six-figure salary, Tubeileh and Mader caused Global Texas to assign her a 1% carried working interest as an incentive. (**Exhibit 3**, 8/26/2022 Assignment to Land.)

50.     Over the course of six years, Tubeileh and Mader executed various additional employment and consulting manager agreements related to Tubeileh's role with the Global U.S. Subsidiaries.

51.     These sham agreements were misused by Tubeileh and Mader to continue to approve investments, employment contracts, loans, and other contracts on behalf of the Global U.S. Subsidiaries that benefitted Tubeileh and Mader personally while furthering Tubeileh's schemes, to the detriment and expense of the Global U.S. Subsidiaries. In several Global U.S.

Subsidiaries transactions, Huddleston or his related entities were involved as well, reaping them millions of dollars.

## MANNER AND MEANS OF THE RICO CONSPIRACY

52.     Beginning in 2017, the many Defendant entities and individuals participated in countless acts of criminal wire fraud, mail fraud, bank fraud, money laundering, and fraud on the United States Government, all for the purpose of obtaining and assigning oil and gas interests, financing loans funded by fraud, and effectuating the transfer of money under false pretenses.

53.     The manner and methods used by Tubeileh to manage and operate the Global Enterprise through a pattern of racketeering activities included, but are not limited to, the Schemes set out below.

## THE SHAM ADVISORY FEE SCHEME

54.     On information and belief, Tubeileh formed Sinostar GmbH, a German company, on or about September 13, 2004; Tubeileh is the managing director and only member (or German equivalent) of Sinostar GmbH.

55.     On or about December 12, 2012, Tubeileh formed Sinostar Investments LLC, which is wholly owned by Sinostar GmbH. On information and belief, Tubeileh is the managing member of Sinostar; Barnett is or was, at various times, its nominal manager.

56.     Sinostar's purported legitimate business activity, on information and belief, is to serve as a holding and investment company for Tubeileh. There is no indication that Sinostar conducted any legitimate business.

57.     In January 2016, on information and belief, Barnett formed Jamalabox. Jamalabox's purported legitimate business activity, on information and belief, consists of importing to the United States soap manufactured by Nablus Soap, a company located in the Middle East and run by Tubeileh's family:



Packaging for Nablus Soap indicating it is imported by Jamalabox LLC.

58.     Huddleston was also involved with Jamalabox and the "marketing launch" of Nablus Soap in the United States, discussed in more detail below.

59.     Beginning in 2017, however, Tubeileh caused the Global U.S. Subsidiaries to pay Jamalabox and Sinostar "advisory" or "consulting" fees under the false pretense that they were owed for services rendered related to various oil and gas interest acquisitions. In reality, Jamalabox offers no such services and did not provide such services to the Global U.S. Subsidiaries. It was all a sham. The Global U.S. Subsidiaries were not involved in the purchase or sale of soap from Palestine.

### A.     Fraudulent advisory fees for Jamalabox as part of the Post Oak transactions.

60.     In July 2017, Tubeileh arranged the purchase of a $1.2 million mineral rights package in West Virginia and caused Global Oklahoma to pay that amount to Post Oak Royalty Partners, LLC ("Post Oak") via wire transfer on July 6, 2017.

61.     Tubeileh then instructed Post Oak to pay a $100,000 advisory fee to Jamalabox, which it did on July 7, 2017.

62.     On information and belief, some or all of these funds were subsequently transferred to Sinostar and/or Huddleston. There was no basis for a payment for advisory services provided from a "Palestinian soap importing company."

63.     On October 10, 2017, Tubeileh caused Global Oklahoma to accept a $1.36 million offer for oil and gas interests sold by M&M Land Consulting through Post Oak:

> 3.    Purchase Terms.
>
> (a)    As consideration for the Assets, Buyer shall tender to Seller the sum of **One Million Three Hundred Sixty Thousand Dollars and No/100 Cents ($1,360,000.00)** (the "Purchase Price").

64.     Tubeileh caused "Global [Oklahoma to] wire Post Oak $1.36mio" and then ensured Post Oak divided that total amount between itself (the actual purchase price of $1.24 million) and Jamalabox ($120,000 for an advisory fee); Huddleston facilitated this deal.

65.     On information and belief, some or all of the $120,000 was then transferred to Sinostar and/or Huddleston.

66.     The purpose of Post Oak paying Jamalabox from the purported $1.36 million "purchase price" with funds provided by Global Oklahoma was to obscure the fact that Global Oklahoma was, in fact, paying Jamalabox.

67.     The scheme was a fraud in that Jamalabox had done nothing to earn an advisory fee. Once again, there was no reason for a Palestinian soap importing company to receive a consulting fee for U.S.-based oil and gas industry transactions. The payment was disguised to allow for an illegal payment to Jamalabox.

**B.     Other fraudulent "advisory fees" or "commissions."**

68.     Throughout 2018 and into early 2019, Tubeileh caused the Global U.S. Subsidiaries to pay more than $5 million in sham "advisory fees" or "commissions" to Jamalabox, Huddleston and his alter-ego companies, and to CA Portfolio Management and CA Funds Group.

69.     On January 16, 2018, Jamalabox—via Tubeileh and signed by Barnett—sent Global Oklahoma an $858,000 invoice for "Consulting/Advisory Services & Introduction" related to Global Oklahoma's purchase of a 23% interest in the Coffield Mineral Package.

70.     Jamalabox, Tubeileh, and Barnett fraudulently represented that the invoice was for "consulting and advisory fees", which was a false statement when made and which was intended to induce payment by Global Oklahoma. 18 U.S.C. § 1341; 18 U.S.C. § 1343.  Jamalabox, a Palestinian soap importing company, obviously did not provide "consulting and advisory services." This was both wire fraud and money laundering.

71.    On or about January 17, 2018, Tubeileh fraudulently caused Global Oklahoma to pay Jamalabox—via check—$858,000 for so-called advisory fees:

| | |
|---|---|
| **To:** | ▮ |
| **From:** | BT[bernard.tubeileh@gog-ag.com] |
| **Sent:** | Mon 1/15/2018 6:18:40 PM (UTC) |
| **Subject:** | AW: Wires |

▮

Global is buying percentages in the H.H. Coffield for a bargain price. It is
critical that the money goes out by tomorrow.
The total purchase price is US$ 4.16 mio for 23% in the H.H. Coffield
minerals properties. As agreed with the seller, the purchase price will be
paid in the tranches to three different companies.

US$ 2,852,000 to

Beneficiary Name: TGT LLC
12222 Merit Drive, Suite 1370, Dallas, TX, 75251
Beneficiary account number: ▮

Beneficiary Bank to Credit: Veritex Community Bank
5049 W Park Blvd, Plano, TX, 75093
Routing number: ▮

-----------

US$ 858,000 to

Beneficiary Name: Jamalabox, LLC
502 S Locust, Skiatook, OK, 74070
Beneficiary account number: ▮8283

Beneficiary Bank: RCB Bank
1001 W Roger Blvd, Skiatook, OK, 74070
Routing number: ▮

------------

US$ 450,000 to

Beneficiary Name: CA Portfolio Management Inc.
70 West Madison St, Suite 1400, Chicago, IL, 60602
Beneficiary account number: ▮4245

Beneficiary Bank: PNC Bank
1 North Franklin, Chicago, IL, 60606
Routing number: ▮

Please let me know immediately when the funds have been wired.

Thx
Bernard

(**Exhibit 4**, 1/15/2018 Email, Tubeileh and Individual #1.)

72.     Tubeileh fraudulently represented that the payment to CA Portfolio Management was for consulting and/or advisory fees, which was a false statement when made and which was intended to induce payment by Global Oklahoma. 18 U.S.C. § 1343.

73.     In a document dated January 19, 2018, CA Portfolio Management—via Tubeileh—sent Global Oklahoma a $450,000 invoice for a "Consulting Fee."

74.     On January 19, 2018, Sinostar recorded revenue of $841,998 via wire as an advisory fee.

75.     On information and belief, CA Portfolio Management transferred some or all of the $450,000 purported consulting fee to Huddleston, BDHL, other third parties, Huddleston's bankruptcy attorney, or paid various debts on Huddleston's behalf, all to avoid the Bankruptcy Court. *See In re Huddleston*, Civ. Action No. 16-31488-sgj-7, 2017 WL 1207522, at *14 (Bankr. N.D. Tex. Mar. 31, 2017).

76.     On February 9, 2018, Tubeileh instructed a Global U.S. Subsidiary employee, Individual #1, to record that January 19, 2018 wire to Sinostar from Jamalabox as "advisory fee income":



(**Exhibit 5**, 2/9/2018 Email, Tubeileh and Individual #1.)

77.     On March 21, 2018, Jamalabox sent Global Oklahoma, via Tubeileh, an invoice for $43,750, which was for made-up "advis[ing]" on a Global Oklahoma transaction with Menoah Petroleum, Inc.; Barnett signed the phony invoice on behalf of Jamalabox.

78.     Jamalabox, Tubeileh, and Barnett fraudulently represented that the invoice was for consulting and/or advisory fees, which was a false statement when made and which was intended to induce payment by Global Oklahoma. 18 U.S.C. § 1343.  There were, obviously, no services provided, it was simply a fraud.

79.     On March 23, 2018, Tubeileh caused Global Oklahoma to wire Jamalabox $43,750.

80.     On March 21, 2018, BDHL sent "Global Oil & Gas AG" an invoice for "expenses" and "consulting services" rendered the day before, totaling $21,250.  Once again, no services were provided—it was simply a fraud.

81.     Tubeileh and BDHL, via Huddleston, fraudulently represented that the payment to BDHL was for consulting services, which was a false statement when made and which was intended to induce payment by Global Oklahoma. 18 U.S.C. § 1343.

82.     On March 23, 2018, Tubeileh caused Global Oklahoma to wire BDHL $21,250.

83.     On March 26, 2018, Sinostar received a deposit from "JAM001" for $42,750.

84.     On March 28, 2018, Tubeileh instructed Individual #1 to directly wire Sinostar $23,500 for "consulting services." (**Exhibit 6**, 3/28/2018 Email, Tubeileh and Individual #1.)

85.     Tubeileh fraudulently represented that this payment was for consulting fees, which was a false statement when made and which was intended to induce payment by Global Oklahoma. 18 U.S.C. § 1343.  There were no "consulting services" provided by Sinostar—it was simply another theft.

86.     This outgoing transaction is reflected in Global Oklahoma's bank account as a "Book Transfer Credit" to Sinostar on March 29, 2018.

87.     On March 20, 2018, BDHL sent "Global Oil & Gas AG" an invoice for $217,000.00 for "consulting services" related to the "Coffield Acquisition."

88.     Tubeileh and BDHL, via Huddleston, fraudulently represented that this payment was for consulting and/or advisory fees, which was a false statement when made and which was intended to induce payment by Global Oklahoma. 18 U.S.C. § 1343.  No "consulting services" were provided—it was just another theft of funds.

89.     On March 29, 2018—after instructing Individual #1 the day before to make a transfer—Tubeileh caused Global Oklahoma to wire BDHL $217,000 related to the Coffield project discussed below. (**Exhibit 7**, 3/28/2018 Email, Tubeileh and Individual #1.)

90.     On March 29, 2018, Tubeileh caused Global Oklahoma to pay BDHL $217,000 via wire transfer.

91.     On March 30, 2018, Tubeileh caused Global Oklahoma to pay Jamalabox $395,000 via wire transfer related to the Coffield project discussed below.

92.     Following on to correspondence from March 29, 2018, on March 30, 2018, Tubeileh asked Individual #1 if all the wires had gone out; Individual #1 responded and Tubeileh asked her for the confirmation numbers.

93.     Tubeileh confirmed and indicated that he received a text—purportedly from someone at Jamalabox—stating the money came in. (**Exhibit 8**, 3/30/2018 Email, Tubeileh and Individual #1.)

94.     On April 2, 2018, Sinostar received a deposit from "Jam001" for $385,000. Sinostar had nothing to justify receiving this payment, which appears to have been solely for the purpose of laundering the money to hide its source.

95.     On April 2, 2018, **after** Tubeileh caused Global Oklahoma to wire the funds, Jamalabox—via Tubeileh—sent Global Oklahoma a $395,000 invoice for made-up "Consulting/Advisory Services & Introduction" related to the March 30, 2018 wire. There were no such "consulting and advisory services."

96.     Jamalabox, Tubeileh, and Barnett fraudulently represented—in an invoice that post-dated the wire—that Jamalabox provided consulting and/or advisory services and was due fees, which was a false statement when made and which was intended to induce payment by Global Oklahoma. 18 U.S.C. § 1343.

97.     On April 23, 2018, Tubeileh instructed Individual #1 to wire $500,000 from Global Oklahoma to Jamalabox for another deal related to the Coffield project, again for non-existent advisory services. (**Exhibit 9**, 4/23/2018 Email, Tubeileh and Individual #1.) There were no such "consulting and advisory services"; this too was a fraudulent wire transfer.

98.     On April 24, 2018, Jamalabox—via Tubeileh and signed by Barnett—sent or emailed Global Oklahoma a $500,000 invoice for purported advisory fees on another acquisition in the Coffield project. (**Exhibit 10**, 4/24/2018 Invoice.)

99.     Jamalabox, Tubeileh, and Barnett fraudulently represented that the invoice was for consulting and/or advisory fees, which was a false statement when made and which was intended to induce payment by Global Oklahoma. 18 U.S.C. § 1343.

100.     On April 24, 2018, Tubeileh caused Global Oklahoma to wire Jamalabox $500,000. Once again, there was no reason for Global Oklahoma to wire money to a Palestinian soap company.

101.     On April 25, 2018, Tubeileh caused Global Oklahoma to wire CA Portfolio Management a $150,000 consulting fee on the same transaction for non-existent consulting services. (*See* **Ex. 9**.)

102.     Tubeileh fraudulently represented that CA Portfolio Management provided consulting and/or advisory services and was due fees, which was a false statement when made and which was intended to induce payment by Global Oklahoma. 18 U.S.C. § 1343.

103.     On information and belief, CA Portfolio Management transferred some or all of the $150,000 purported consulting fee to Huddleston, BDHL, other third parties, Huddleston's bankruptcy attorney, or paid various debts on Huddleston's behalf, all in an effort to avoid the Bankruptcy Court.

104.   The next day, on April 25, 2018, Sinostar received a $365,000 deposit from "JAM001."

105.   On May 23, 2018, Tubeileh caused Global Oklahoma to purchase mineral acreage in the Marcellus Shale for a total price of $3,498,000, part of which—$373,000—was an "advisor[y]" and "commission" to Jamalabox.

106.   Tubeileh fraudulently represented that Jamalabox provided consulting and/or advisory services and was due fees, which was a false statement when made and which was intended to induce payment by Global Oklahoma. 18 U.S.C. § 1343.

107.   Tubeileh fraudulently instructed Individual #1 to execute the wires, including one to Jamalabox for $373,000 and another to CA Portfolio Management for $175,000. (**Exhibit 11**, 5/24/2018 Email, Tubeileh and Individual #1.)

108.   Tubeileh fraudulently represented that CA Portfolio Management provided consulting and/or advisory services and was due fees, which was a false statement when made and which was intended to induce payment by Global Oklahoma. 18 U.S.C. § 1343.

109.   On June 1, 2018, Tubeileh fraudulently caused Global Oklahoma to wire $373,000 to Jamalabox.

110.   On June 1, 2018, Tubeileh fraudulently caused Global Oklahoma to wire $175,000 to CA Portfolio Management.

111.   On information and belief, CA Portfolio Management transferred some or all of that $175,000 to Huddleston, BDHL, other third parties, Huddleston's bankruptcy attorney, or paid various debts on Huddleston's behalf, all in an effort to avoid the Bankruptcy Court.

112.   On June 4, 2018, Sinostar received a $365,000 deposit from "JAM001." The purpose of this transfer was to launder money illegally obtained.

113.     On July 31, 2018, Tubeileh fraudulently caused Global Oklahoma to wire Jamalabox $1.1 million for "Consulting PSA PennVirginia OK Asset Acquisition, 20% share."

114.     Tubeileh fraudulently represented that Jamalabox provided consulting and/or advisory services and was due fees, which was a false statement when made and which was intended to induce payment by Global Oklahoma. 18 U.S.C. § 1343.

115.     On July 31, 2018, Tubeileh fraudulently caused Global Oklahoma to wire CA Funds Group $500,000 for "Consulting PennVirginia OK Assets Acquisition" for non-existent consulting services.

116.     Tubeileh fraudulently represented that CA Funds Group provided consulting and/or advisory services and was due fees, which was a false statement when made and which was intended to induce payment by Global Oklahoma. 18 U.S.C. § 1343.

117.     On information and belief, CA Funds Group transferred some or all of that $500,000 to Huddleston, BDHL, other third parties, Huddleston's bankruptcy attorney, or paid various debts on Huddleston's behalf, all in an effort to avoid the Bankruptcy Court.

118.     Tubeileh instructed Individual #1 that because there was not enough capital available, Global Oklahoma should wire the rest of the funds to Jamalabox as soon as funds were available, which Tubeileh knew would be the next day.

119.     On August 1, 2018, Tubeileh caused Global Oklahoma to wire Jamalabox an additional $300,319.76 as a fraudulent consulting fee. There were no such "consulting and advisory services."

120.     Tubeileh thus fraudulently represented that Jamalabox provided consulting and/or advisory services and was due fees, which was a false statement when made and which was intended to induce payment by Global Oklahoma. 18 U.S.C. § 1343.

121.    On August 1, 2018, Sinostar received a deposit of $1,100,000, which it booked as an "advisory fee" from "JAM001." The apparent purpose of this transfer was to launder money and to disguise the true source of the funds, which constitutes fraud.

122.    On August 2, 2018, Sinostar received a deposit from "JAM001" for $260,319.79, which it recorded as an "advisory fee," although no advisory services were provided. The purpose of this transfer was to launder the money and hide its source.  As repeatedly stated herein, neither Sinostar nor Jamalabox provided any services to the Global U.S. Subsidiaries—ever.

123.    On September 12, 2018, Tubeileh approved a $500,000 wire to Jamalabox from Global Oklahoma for "[c]onsulting" related to the Coffield investment. There were no such "consulting and advisory services," and this too was fraudulent.

124.    Tubeileh fraudulently represented that Jamalabox provided consulting and/or advisory services and was due fees, which was a false statement when made and which was intended to induce payment by Global Oklahoma. 18 U.S.C. § 1343.

125.    CA Funds Group was also set to receive $150,000 for "consulting" on the same transaction.

126.    Tubeileh fraudulently represented that CA Funds Group provided consulting and/or advisory services and was due fees, which was a false statement when made and which was intended to induce payment by Global Oklahoma. 18 U.S.C. § 1343.

127.    On September 14, 2018, Tubeileh caused Global Oklahoma to wire CA Funds Group $150,000.

128.    On information and belief, CA Funds Group transferred some or all of this $150,000 "consulting" fee to Huddleston, BDHL, other third parties, Huddleston's bankruptcy attorney, or paid various debts on Huddleston's behalf, all in an effort to avoid the Bankruptcy Court.

129.    On September 20, 2018, Tubeileh caused Global Oklahoma to wire Jamalabox $500,000 for consulting fees. There were no such "consulting" services.

130.    Tubeileh fraudulently represented that Jamalabox provided consulting and/or advisory services and was due fees, which was a false statement when made and which was intended to induce payment by Global Oklahoma. 18 U.S.C. § 1343.

131.    On September 21, 2018, Sinostar received a $490,000 deposit from "JAM001" that it booked as an "advisory fee." The apparent purpose of this transfer was to launder the money.

132.    On January 30, 2019, Tubeileh and Mader approved "delayed and last advisory / consulting" fees to Jamalabox related to the Coffield investment. There were no such "consulting" services.

133.    Tubeileh fraudulently represented that Jamalabox provided consulting and/or advisory services and was due fees, which was a false statement when made and which was intended to induce payment by Global Oklahoma. 18 U.S.C. § 1343.

134.    On January 30, 2019, Tubeileh caused Global Oklahoma to wire Jamalabox $350,000 for "1st Part Commission Hardeman County 3Rd Well."

135.    On January 31, 2019, Tubeileh caused Global Oklahoma to wire Jamalabox $150,000 for "2ND Part Commission Hardeman County 3Rd Well."

136.    On information and belief, some or all of these two wires was subsequently wired or otherwise transferred to Sinostar.

137.    Later, when Lori Land—who replaced Individual #1—questioned the payments to Jamalabox, Tubeileh claimed that it was "John[ Barnett]'s consulting company" and it had "brought a few deals" to the Global U.S. Subsidiaries in 2018. Not only was this untrue, but it was Tubeileh's attempt to cover up the sham transactions.

138.    The transfers to CA Portfolio Management and CA Funds Group, totaling more than $1.4 million in fraudulent, non-existent commission or advisory fees, are reflected by the table below:

| Date | From | To | Amount | Transferred to |
|------|------|-----|--------|----------------|
| 1/17/2018 | Global Oklahoma | CA Portfolio Mgmt. | $450,000.00 | Huddleston, someone on his behalf, or an entity controlled by him |
| 4/25/2018 | Global Oklahoma | CA Portfolio Mgmt. | $150,000.00 | Huddleston, someone on his behalf, or an entity controlled by him |
| 6/1/2018 | Global Oklahoma | CA Portfolio Management | $175,000.00 | Huddleston, someone on his behalf, or an entity controlled by him |
| 7/31/2018 | Global Oklahoma | CA Funds Group | $500,000.00 | Huddleston, someone on his behalf, or an entity controlled by him |
| 9/14/2018 | Global Oklahoma | CA Funds Group | $150,000.00 | Huddleston, someone on his behalf, or an entity controlled by him |
| | | | $1,425,000.00 | |

139.    In addition, Huddleston or his companies directly received more than $200,000 in fraudulent advisory or consulting fees, reflected in the table below:

| Date | From | To | Amount |
|------|------|-----|--------|
| 3/23/2018 | Global Oklahoma | BDHL | $21,250.00 |
| 3/29/2018 | Global Oklahoma | BDHL | $217,000.00 |
| | | | $238,250.00 |

140.    In sum, directly or indirectly, Huddleston, his alter-ego companies, and third parties to whom Huddleston owed debts received more than $1.6 million from the Global U.S. Subsidiaries, laundered through CA Portfolio Management and CA Funds Group, to obscure the true source of the funds and to avoid detection by the United States Bankruptcy Court.

141.    As for Jamalabox, in total, Tubeileh caused Global Oklahoma to pay the Palestinian soap distributor—and ultimately Sinostar—over $4.5 million in fraudulent *oil and gas* "advisory" or "consulting" fees over the course of roughly fifteen months, as reflected by the table below:

| Date | From | To | Amount | Transferred to | Received |
|------|------|-----|--------|----------------|----------|
| 7/7/2017 | Global Oklahoma | Post Oak | $100,000.00 | Jamalabox, then Sinostar or Huddleston | $100,000.00 |
| 10/10/2017 | Global Oklahoma | Post Oak | $120,000.00 | Jamalabox, then Sinostar or Huddleston | $120,000.00 |
| 1/17/2018 | Global Oklahoma | Jamalabox | $858,000.00 | Sinostar | $841,998.00 |
| 3/23/2018 | Global Oklahoma | Jamalabox | $43,750.00 | Sinostar | $42,750.00 |
| 3/28/2018 | Global Oklahoma | Sinostar | $23,500.00 | N/A | $23,500.00 |
| 3/30/2018 | Global Oklahoma | Jamalabox | $395,000.00 | Sinostar | $385,000.00 |
| 4/24/2018 | Global Oklahoma | Jamalabox | $500,000.00 | Sinostar | $365,000.00 |
| 6/1/2018 | Global Oklahoma | Jamalabox | $373,000.00 | Sinostar | $365,000.00 |
| 7/31/2019 | Global Oklahoma | Jamalabox | $1,100,000.00 | Sinostar | $1,100,000.00 |
| 8/1/2018 | Global Oklahoma | Jamalabox | $300,319.76 | Sinostar | $260,319.79 |
| 9/20/2018 | Global Oklahoma | Jamalabox | $500,000.00 | Sinostar | $490,000.00 |
| 1/30/2019 | Global Oklahoma | Jamalabox | $350,000.00 | Sinostar, on information and belief | $350,000.00 |
| 1/30/2019 | Global Oklahoma | Jamalabox | $150,000.00 | Sinostar, on information and belief | $150,000.00 |
| **Totals** | | | **$4,813,569.76** | | **$4,593,567.79** |

142.    The funds Jamalabox obtained from these transactions were fraudulently obtained through mail and/or wire fraud, as discussed above. 18 U.S.C. § 1341; 18 U.S.C. § 1343.

143.    The subsequent transfers by Jamalabox to Sinostar constitute: (1) monetary transactions using criminally derived property knowingly derived from unlawful activity in violation of 18 U.S.C. § 1957(a); (2) transactions done with the intent to promote or carry on specified unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(A)(i); and (3) are financial transactions done with knowledge that the proceeds are from unlawful activity and with the intent

that each transaction was designed, in whole or in part, to conceal the nature, source, ownership or control of the proceeds of the specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

144.    The funds CA Portfolio Management and CA Funds Group obtained from these transactions were fraudulently obtained through mail and/or wire fraud, as discussed above. 18 U.S.C. § 1341; 18 U.S.C. § 1343.

145.    The subsequent transfers by CA Portfolio Management and CA Funds to Huddleston and his alter-ego companies, and/or others on behalf of Huddleston constitute: (1) monetary transactions using criminally derived property knowingly derived from unlawful activity in violation of 18 U.S.C. § 1957(a); (2) transactions done with the intent to promote or carry on specified unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(A)(i); (3) are financial transactions done with knowledge that the proceeds are from unlawful activity and with the intent that each transaction was designed, in whole or in part, to conceal the nature, source, ownership or control of the proceeds of the specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and (4) fraud on the United States Bankruptcy Court, in violation of 18 U.S.C. § 152(1).

146.    The funds BDHL directly obtained from these transactions were fraudulently obtained through mail and/or wire fraud, as discussed above. 18 U.S.C. § 1341; 18 U.S.C. § 1343.

147.    The funds Sinostar directly obtained from these transactions were fraudulently obtained through mail and/or wire fraud, as discussed above. 18 U.S.C. § 1341; 18 U.S.C. § 1343.

148.    The entire Sham Advisory Fee Scheme, because of Tubeileh's fraudulent conduct—papering over his activities with sham invoices and various material misrepresentations and omissions—was concealed from the Global U.S. Subsidiaries. The truth and extent of this fraud was not discovered until after Tubeileh's resignation in May 2023.

### THE SELF-DEALING LOANS SCHEME

149.    At the beginning of 2018, Sinostar had **just over $40,000** in assets and less than $100 in its savings account.

150.    By the beginning of 2019, because of the sham transfers from Jamalabox—facilitated by Tubeileh and Barnett and to the detriment of the Global U.S. Subsidiaries—Sinostar had, on information and belief, **more than $4 million** in its accounts. *See supra* ¶¶ 54–148.

151.    Incredibly, beginning in 2018 and continuing to 2023, Tubeileh used the fraudulently obtained funds from the Global U.S. Subsidiaries to cause the Global U.S. Subsidiaries to take loans from Sinostar with the Global U.S. Subsidiaries' own money.  It is as if Tubeileh, as a bank president, robbed a bank and then loaned the money back to the same bank, but at an exorbitant rate of interest—which, as the bank president, he agreed to pay on the bank's behalf.

152.    Sinostar used the loans—most of which were signed by Tubeileh on behalf of the Global U.S. Subsidiaries and by Barnett on behalf of Sinostar—to not only accrue interest at commercially unreasonable rates, but also to misappropriate the Global U.S. Subsidiaries' interests in various oil and gas investment projects and avoid oversight from or detection by Global AG.

### A.    Sinostar Fraudulent Loan 1 and the Related Oil and Gas Investments.

153.    The next part shows incredible arrogance and criminal intent. Using the money Jamalabox improperly obtained from the Global U.S. Subsidiaries and then transferred to Sinostar, in February 2018 Tubeileh caused Global Texas to agree to a loan from Sinostar.

154.    Effective February 22, 2018, Tubeileh caused Global Texas to agree to the first loan ("Sinostar Loan 1"). Sinostar Loan 1 was between Sinostar and Global Texas for a principal amount of $1,500,000.00 and accrued interest at 2% per month. Tubeileh signed on behalf of Global Texas; Barnett signed on behalf of Sinostar.

155.    Sinostar Loan 1 was to be a "revolving line of credit" between Global Texas and Sinostar for "drilling and completion and re-drilling activities of oil and gas wells in Hardeman County, Texas and Jackson County, Oklahoma."

156.    Apart from monetary interest on the principal, Tubeileh caused Global Texas to agree to give Sinostar a 2.5% carried working interest in "each new well/wellbore in the Drilling Area as of the Effective Date, staring with the Hanner Hatcher 1H [well]."

157.    The money Jamalabox obtained was procured by fraud. 18 U.S.C. § 1343. The money was laundered to Sinostar. 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B). And the loan from Sinostar to Global Oklahoma was with funds derived from specified unlawful activity. 18 U.S.C. § 1957(a).

### 1.    Tubeileh causes the Global U.S. Subsidiaries to invest in Hardeman County under Sinostar Loan 1.

158.    With Sinostar Loan 1in effect, Tubeileh fraudulently caused Global Oklahoma to invest in several wells in Hardeman County, Texas. With this, Tubeileh then could fraudulently assign various oil and gas interests to various individuals and companies, including himself and Jamalabox.

159.    On April 9, 2018, Global Oklahoma and Dome Holdings, LLC entered into a Participation Agreement for the Gilliam No. 1-H well.

160.    On April 9, 2018, Tubeileh fraudulently caused Global Oklahoma to assign Jamalabox a 1% overriding royalty interest ("ORRI")[3] in Gilliam No. 1-H well and related leases. Tubeileh signed on behalf of Global Oklahoma, Barnett signed on behalf of Jamalabox, and

---

[3] An overriding royalty interest is a non-cost-bearing and non-operating interest carved out of a working interest that entitles the holder to a royalty from applicable production. An ORRI can be carved out of the mineral estate or out of an oil and gas lease. If it is the latter, the ORRI terminates when the underlying lease ends.

Huddleston, Boris Starokozhev—a purported geologist and friend of Tubeileh and Huddleston—and others signed as witnesses:



Signature Page of Transfer (**Exhibit 12**, 4/9/2018 ORRI Assignment)

161.    On April 11, 2018, Barnett caused Jamalabox to transfer that same interest in Gilliam No. 1-H to Sinostar. John Barnett signed on behalf of both Sinostar and Jamalabox:



Signature Page of Transfer (**Exhibit 13**, 4/11/2018 ORRI Assignment)

162.    On August 18, 2018, for no legitimate reason, Tubeileh caused Global Oklahoma to assign Tubeileh, personally, a 1% ORRI in Gilliam No. 1-H and any future Hardeman Project well. Tubeileh signed on behalf of himself and Global Oklahoma; Huddleston signed as a witness:

IN WITNESS WHEREOF this assignment is executed and made effective as of August 18, 2018.

WITNESSES:

Printed Name:

Printed Name: JOHN PHILLIPS

Printed Name:_____

Printed Name:_____

ASSIGNOR:
GLOBAL OIL & GAS FIELDS OKLAHOMA LLC

By:_____
Name: Bernard Tubeileh
Title: Manager

ASSIGNEE:
Bernard Tubeileh

By:_____
Name: Bernard Tubeileh
Title:

### B.    Sinostar Fraudulent Loan 2 and the Related Oil and Gas Investments.

163.    Using the money Sinostar improperly obtained from Jamalabox, in October 2018 Tubeileh caused Global Oklahoma to agree to take yet another money laundering loan from Sinostar.

164.    Effective October 29, 2018, Tubeileh fraudulently caused Global Texas to agree to a second illicit loan ("Sinostar Loan 2"). Sinostar Loan 2, from Sinostar to Global Oklahoma, had a principal amount of $2,000,000 and accrued interest at 2% per month. Tubeileh signed on behalf of Global Oklahoma; Barnett signed on behalf of Sinostar.

165.    Sinostar Loan 2 was a "revolving line of credit between" Global Oklahoma and Sinostar that Global Oklahoma could use for acquiring oil and gas leases in Hardeman County, Texas and Jackson County, Oklahoma.

166.    Sinostar Loan 2 also provided that, in addition to interest on principal, if Global Oklahoma "requests [Sinostar]" to "pay directly for certain Leases," those leases became Sinostar's "property" and Global Oklahoma had the right to "acquire" them, "in exchange for [Sinostar's] total expenses … plus outstanding interest" on Sinostar Loan 2.

167.    The money Jamalabox obtained was procured by fraud. 18 U.S.C. § 1343. The money was laundered to Sinostar. 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B). And the loan from Sinostar to Global Oklahoma was with funds derived from specified unlawful activity. 18 U.S.C. § 1957(a).

34

### 1. Tubeileh furthers the Global U.S. Subsidiaries' investment in Hardeman County under Sinostar Fraudulent Loan 2.

168. On November 13, 2018, Tubeileh, on behalf of Global Oklahoma, informed Barnett that Global Oklahoma would draw $2,000,000 from Sinostar Loan 2 and have Sinostar directly wire (wire fraud) that amount to Ted W. Walters & Associates, LLC. (**Exhibit 14**, 11/13/2018 Letter.)

169. On November 26, 2018, Tubeileh caused Global Oklahoma to fraudulently assign Tubeileh, personally, a 1% ORRI in the Johnson No. 1-H well. Tubeileh signed on behalf of himself and on behalf of Global Oklahoma. Huddleson signed as a witness. (**Exhibit 15**, 11/26/2018 ORRI Assignment.)

170. At the same time, Tubeileh caused Global Oklahoma to fraudulently assign 0.25 ORRIs to both the CA Portfolio Management and Bryant-Link Company, LLC.

171. On December 7, 2018, Tubeileh, on behalf of Global Oklahoma, informed Barnett that Global Oklahoma would draw $500,000 from the Sinostar Loan 2 and have Sinostar directly wire that amount to Company #3. (**Exhibit 16**, 12/7/2018 Letter.)

172. On December 11, 2018, Tubeileh, on behalf of Global Oklahoma, informed Barnett that Global Oklahoma would draw $500,000 from the Sinostar Loan 2 and have Sinostar directly wire that amount to Company #3.

173. Global Oklahoma repaid this fraudulent loan on December 21, 2018, for the full outstanding principal amount plus interest: $2,022,754.67.

174. On February 5, 2019, Tubeileh fraudulently caused Global Oklahoma to assign him a 5.45% ORRI in Embry No. 1-H. Tubeileh signed on behalf of himself and on behalf of Global Oklahoma. Huddleston served as the witness.

175.    The money Jamalabox obtained was procured by fraud. 18 U.S.C. § 1343. The money was laundered to Sinostar. 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B). And the loan from Sinostar to Global Oklahoma was with funds derived from specified unlawful activity. 18 U.S.C. § 1957(a).

### C.    Sinostar Fraudulent Loan 3.

176.    Using the money Jamalabox illegally obtained from the Global U.S. Subsidiaries and then transferred to Sinostar, in February 2019 Tubeileh caused Global Oklahoma to agree to take yet another fraudulent loan from Sinostar.

177.    Effective February 12, 2019, Tubeileh caused Global Oklahoma to agree to a third illicit loan ("Sinostar Loan 3"). Sinostar Loan 3, between Global Oklahoma and Sinostar, had a principal amount of $1,500,000.

178.    Instead of interest, however, Sinostar and Global Oklahoma agreed on "[c]ash [c]ompensation as [i]nterest," which required Global Oklahoma to pay Sinostar 2.5% of each well's authorization for expenditure ("AFE")[4] cost—"for a period of five (5) years" regardless of "whether the Loan has been repaid or not"—"for each well to be drilled or re-drilled in the "Drilling Area," which was Hardeman County, Texas.

### D.    Amendments to Sinostar Fraudulent Loan 1 and the Related Oil and Gas Investments.

179.    On February 26, 2019, Tubeileh caused Sinostar and Global Oklahoma to amend Sinostar Loan 1 to expand its purpose to include financing the balance of the Wildman 1H well.[5]

---

[4] An authorization for expenditure is essentially an invoice sent by the operator or well owner to equity partners and details the costs required to fund the well. The cost for any one equity partner is commensurate with the percentage ownership. That is, if Global Oklahoma was a 50% partner, it should have, in the normal course, been responsible for 50% of the cost.

[5] This Amendment mistakenly states the effective date of Sinostar Loan 1 is February 22, 2019.

He also caused an amendment to Section 2.2, which provided that Global Oklahoma would also give Sinostar a 2.5% carried working interest "in each new well/wellbore in the Drilling Area [that included Hardeman County, Texas and Jackson County, Oklahoma] … starting with Hanner Hatcher 1H." Tubeileh fraudulently signed on behalf of the Global U.S. Subsidiaries, Barnett fraudulently signed on behalf of Sinostar.

180.    This entire transaction constituted mail or wire fraud and money laundering. 18 U.S.C. § 1343; 18 U.S.C. § 1956; 18 U.S.C. § 1957.

181.    On April 1, 2019, Tubeileh caused Global Texas to fraudulently assign Tubeileh a 1% ORRI in Johnson No. 1-H and related leases. Tubeileh signed on behalf of himself and on behalf of Global Texas. Huddleston signed as a witness.

182.    On April 2, 2019, Tubeileh caused Global Texas to fraudulently assign Tubeileh a 5% ORRI in Hanner Hatcher No. 1-H and related leases. Tubeileh signed on behalf of himself and on behalf of Global Texas.

183.    On April 2, 2019, Tubeileh caused Global Texas to fraudulently assign PetroQuest Exploration Inc., another one of Huddleston's companies, a 0.35 ORRI in Hanner Hatcher No. 1-H. Huddleston signed on behalf of PetroQuest; Tubeileh signed for Global Texas. (**Exhibit 17**, 4/2/2019 ORRI Assignment.)

184.    On April 8, 2019, Tubeileh fraudulently caused Global Oklahoma and Sinostar to amend Sinostar Loan 1 again.[6] This amendment added that Global Oklahoma would grant Sinostar a 1% ORRI in "each and any new well/wellbore" that Global Oklahoma drills "in the Drilling Area." Tubeileh signed on behalf of the Global U.S. Subsidiaries (both Global Texas (which pledged collateral) and Global Oklahoma); Barnett signed on behalf of Sinostar.

---

[6] This Amendment mistakenly states the effective date of Sinostar Loan 1 is February 22, 2019.

185.    On April 17, 2019, Tubeileh fraudulently caused Global Oklahoma and Sinostar to amend Sinostar Loan 1 for the third time.[7] This amendment added that, if Global Oklahoma invested or drilled in any Cleveland Sand well in Washita County, Oklahoma, Global Oklahoma would give Sinostar 10% of its carried working interest in any such well.

186.    Between April 19, 2019, and April 22, 2019, Tubeileh caused Global Texas to exchange Tubeileh's 5% working interest in the Johnson No. 1-H well for a 1% ORRI in the same well. Tubeileh signed the reassignment on behalf of both himself and Global Texas.

187.    On April 23, 2019, Tubeileh fraudulently caused Global Texas to assign him a 1% ORRI in the Gilliam No. 1-H well and leases. Tubeileh signed on behalf of himself and Global Texas; Huddleson signed as a witness.

188.    On May 25, 2022, Tubeileh informed Land that he had sold his ORRIs in all Hardeman County wells (including Gilliam No. 1-H) to Sinostar and instructed her to set up wire transfers to Sinostar to reflect the sale of these ORRIs. (**Exhibit 18**, 5/25/2022 Emails, Tubeileh and Land.)

189.    On June 1, 2022, Tubeileh personally executed a purchase and sale agreement with Sinostar for his ORRIs in the Hardeman Project, as well as any future ORRI rights Tubeileh may obtain in wells drilled by the Global U.S. Subsidiaries in Hardeman County, in exchange for $687,500. Tubeileh signed the purchase and sale agreement on behalf of himself, and there is a signature above the printed "John Barnett," on behalf of Sinostar. (**Exhibit 19**, 6/1/2022 Purchase and Sale Agreement.)

190.    The money Jamalabox obtained was procured by fraud. 18 U.S.C. § 1343. The money was laundered to Sinostar. 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B). And the loan from

---

[7] This Amendment mistakenly states the effective date of Sinostar Loan 1 is February 22, 2019.

Sinostar to Global Oklahoma was with funds derived from specified unlawful activity. 18 U.S.C. § 1957(a).

### E.   Sinostar Fraudulent Loan 4 and the Related Oil and Gas Investments.

191.    Using the money Jamalabox illegally obtained from the Global U.S. Subsidiaries and then transferred to Sinostar, in July 2019, Tubeileh caused Global Oklahoma to agree to take another fraudulent loan from Sinostar.

192.    Effective July 15, 2019, Tubeileh fraudulently caused Global Texas, Global Oklahoma, and Sinostar to agree to a restated version of Sinostar Loan 1 ("Sinostar Loan 4").[8] Sinostar Loan 4 was for $2,500,000 and carried 2% interest **per month**. Tubeileh signed on behalf of Global Oklahoma and Global Texas; Barnett signed on behalf of Sinostar.

193.    The purpose of Sinostar Loan 4 was for: (1) drilling in Hardeman County, Texas and Jackson County, Oklahoma; (2) "financing the balance of the Wildman 1H well[;]" (3) "financing the drilling of a Cleveland Sand [W]ell in Washita County, Oklahoma" with U.S. Energy Exploration Corporation; and (4) "the purchase of a participation in the HH Coffield Estate Mineral Package" with Company #1.

194.    Company #1 is a Texas company that is also involved in the oil and gas industry and, on information and belief, operated out of the same office building as Global Oklahoma, Global Texas, BDHL, and Huddleston.

195.    Tubeileh caused Global Oklahoma to fraudulently agree to give Sinostar: (1) a 1% ORRI in each well drilled in Hardeman County, Texas and Jackson County, Oklahoma; (2) a 2.5% carried working interest in "any well drilled in Ohio or Pennsylvania" by US Energy; and (3) a 3% ORRI in any Cleveland Sand Well (Washita County, Oklahoma or Cleveland County, Oklahoma).

---

[8] This restated version mistakenly states the effective date of Sinostar Loan 1 is February 22, 2019.

196.    The money Jamalabox obtained was procured by fraud. 18 U.S.C. § 1343. The money was laundered to Sinostar. 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B). And the loan from Sinostar to Global Oklahoma was with funds derived from specified unlawful activity. 18 U.S.C. § 1957(a).

### 1.    Tubeileh Causes the Global U.S. Subsidiaries to invest in the Coffield Mineral Estate.

197.    With Sinostar Loan 4 in place, Tubeileh caused the Global U.S. Subsidiaries to invest in the H.H. Coffield Estate in Dimmit County, Texas (the Coffield Project).

198.    In the first transaction on July 15, 2019, Tubeileh caused Global Oklahoma to purchase a 72% stake in Company #1's ownership interests in the Coffield Project for $2,400,000. (**Exhibit 20**, 7/15/2019 Purchase/Sale Agreement, Company #1 and Global Oklahoma.)

199.    Company #1 agreed to pay Global Oklahoma 40% of its July revenue check, *i.e.*, the revenues that Company #1 would have recognized that month had it not sold to Global Oklahoma. (**Ex. 20**.)

200.    In the second transaction on July 15, 2019, Tubeileh personally purchased 20% of Company #1's ownership interests in the Coffield Project for $95,000. Company #1 also agreed to give Tubeileh 10% of its July 2019 revenue check. (**Exhibit 21**, 7/15/2019 Purchase/Sale Agreement, Company #1 and Tubeileh.)

201.    On information and belief, Tubeileh made the purchase with funds obtained by the wire fraud described herein.

202.    Despite these transactions taking place **on the same day**, involving the **same seller** and **same property interests**, Tubeileh obtained significantly more favorable terms for himself than he did for Global Oklahoma. Global Oklahoma's cost was approximately seven times what Tubeileh himself paid.

203.    If Global Oklahoma had received the same terms Tubeileh arranged for himself, Global Oklahoma would have paid substantially less for Company #1's interests. Thus, Global Oklahoma not only paid substantially more per percentage than Tubeileh, but also lost out on a portion of the July 2019 royalty check.

### F.    Sinostar Fraudulent Loan 5

204.    Using the money Jamalabox illegally obtained from the Global U.S. Subsidiaries and then transferred to Sinostar, in February 2020 Tubeileh caused Global Oklahoma to agree to take another fraudulent loan from Sinostar.

205.    On February 21, 2020, Tubeileh caused Global Texas to fraudulently agree to a loan from Sinostar with a principal amount of $1,600,000 and interest accruing at 12% each year ("Sinostar Loan 5"). Tubeileh signed on behalf of Global Texas; Barnett signed on behalf of Sinostar.

206.    The purpose of Sinostar Loan 5 was for "drilling and completion of an oil and gas well (the 'Well')" in the "'Welcome Prospect' in Columbia County, Arkansas" and any other "reef structure developed as part of the 'Smackover Middle Ramp Reef'" area.

207.    In addition to interest, Tubeileh caused Global Texas to fraudulently grant Sinostar the option to acquire 50% of Global Texas's 45% interest in any Well, and Sinostar's "payment" for its interest in that acquisition would be "in the form of a credit and setoff against the outstanding principal balance of" Sinostar Loan 5.

208.    On August 7, 2020, Tubeileh fraudulently caused Global Texas and Sinostar to amend Sinostar Loan 5 to increase the principal to $1,650,000 and expand the purpose to include leasing additional acreage in the "Eastern Reef."

209.    That amendment also increased Sinostar's option to purchase Global Texas's interest to 75% of Global Texas's now-50.5% interest in the "Well and any subsequent wells," but maintained the cost for that acquisition would be set off against principal.

210.    On September 3, 2020, Tubeileh fraudulently caused Global Texas and Sinostar to amend Sinostar Loan 5 again, this time to increase the principal to $1,850,000 and to expand the purpose to include drilling in the "Dupont Prospect in Iberville Parish, Louisiana."

211.    On April 20, 2021, Tubeileh fraudulently caused Global Texas and Sinostar to amend Sinostar Loan 5 a third time, this time to increase the principal to $2,250,000 and to expand the purpose to include "participating in three vertical wells in Hopkins County, Kentucky"— which, as discussed below, were run by Blackhorn and were a sham. The interest rate also increased to 15%, but Sinostar's participation options did not change.

212.    The money Jamalabox obtained was procured by fraud. 18 U.S.C. § 1343. The money was laundered to Sinostar. 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B). And the loan from Sinostar to Global Oklahoma was with funds derived from specified unlawful activity. 18 U.S.C. § 1957(a).

### G.    Sinostar Fraudulent Loan 6

213.    Using the money Jamalabox illegally obtained from the Global U.S. Subsidiaries and then transferred to Sinostar, in June 2021 Tubeileh caused Global Oklahoma to agree to take another fraudulent loan from Sinostar.

214.    On June 18, 2021, Tubeileh fraudulently caused Global Texas and Sinostar to agree to a loan ("Sinostar Loan 6") that rolled over the balance due on Sinostar Loan 5, for which the outstanding principal and accrued interest was $1,824,327. Interest on this new loan accrued at 15% each year. Tubeileh signed on behalf of Global Texas; Barnett signed on behalf of Sinostar.

42

215.    This loan is the subject of ongoing litigation in the State of Texas, *Tubeileh,* et al., *v. Global Oil & Gas Texas, LLC,* et al., Case No. DC-23-07534 (68th Jud. Dist., Dallas Cnty.).

216.    The money Jamalabox obtained was procured by fraud. 18 U.S.C. § 1343. The money was laundered to Sinostar. 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B). And the loan from Sinostar to Global Oklahoma was with funds derived from specified unlawful activity. 18 U.S.C. § 1957(a).

### H.    Sinostar Fraudulent Loan 7

217.    Using the money Jamalabox illegally obtained from the Global U.S. Subsidiaries and then transferred to Sinostar, in February 2023 Tubeileh caused Global Texas to agree to another fraudulent loan from Sinostar.

218.    On February 15, 2023, Mader and Tubeileh fraudulently caused Global Texas to enter into a loan agreement with Sinostar ("Sinostar Loan 7"). Sinostar Loan 7 had a principal amount of $1,227,917.61 and interest that accrued "at a rate equal to Twelve (12%) percent per annum." Mader signed on behalf of Global Texas and Global Oklahoma; Tubeileh signed on behalf of Sinostar.

219.    Tubeileh personally acquired this loan from Sinostar the same day it was made, February 15, 2023.

220.    This loan is the subject of ongoing litigation in the State of Texas, *Tubeileh v. Global Oil & Gas Texas, LLC*, Case No. DC-23-07534 (68th Jud. Dist., Dallas Cnty.).

221.    The money Jamalabox obtained was procured by fraud. 18 U.S.C. § 1343. The money was laundered to Sinostar. 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B). And the loan from Sinostar to Global Oklahoma was with funds derived from specified unlawful activity. 18 U.S.C. § 1957(a).

### I.      Tubeileh's Fraudulent Loans

222.     Using the money Jamalabox illegally obtained from the Global U.S. Subsidiaries and then transferred to Sinostar, in March 2023 Tubeileh caused Global Texas to agree to another fraudulent loan from Sinostar.

223.     On March 15, 2023, Tubeileh and Mader fraudulently caused Global Texas to enter into a loan with Tubeileh ("Tubeileh Loan 1"). Tubeileh Loan 1 had a principal amount of $1,861,3589.41 and accrued interest at 15% per annum. Mader signed for Global Texas; Tubeileh signed for himself.

224.     The principal of this loan was a combination of two amounts: (1) the "outstanding principal" on Sinostar Loan 7, $1,191,759.41; and (2) $669,600.00 "in outstanding purchase price payments for Overriding Royalties in the wells: Fatheree 2 (Illinois), Blackhorn 1 (Kentucky) and Skipworth 9 (Kentucky). It then cross-references several documents related to the purported sale of ORRIs related to the Blackhorn project. (*See infra* ¶¶ 251–309.)

225.     On March 17, 2023, Tubeileh and Mader caused Global Texas to agree to a loan with Tubeileh ("Tubeileh Loan 2"). Tubeileh Loan 2 had a principal amount of $405,598.43 and accrued interest at 15% per annum. Mader signed for Global Texas; Tubeileh signed for himself.

226.     This loan is the subject of ongoing litigation in the State of Texas, *Tubeileh,* et al., *v. Global Oil & Gas Texas, LLC, et al.*, Case No. DC-23-07534 (68th Jud. Dist., Dallas Cnty.).

227.     The entire Self-Dealing Loan Scheme, because of Tubeileh's fraudulent conduct—concealing the true nature and origin of the loans and their terms, with the help of Dr. Mader, Barnett, Huddleston, and others—was concealed from the Global U.S. Subsidiaries. The truth and extent of this fraud was not discovered until after Tubeileh's resignation in May 2023.

### THE COMMISSIONS SCHEME

228.    Tubeileh also structured various deals in a way that would allow him to conceal and reap commission payments—in addition to the sham "advisory" fees discussed above—paid by the Global U.S. Subsidiaries. Tubeileh also ensured others could profit too, including Huddleston. Three examples follow.

**A.      Capstone.**

229.    In September 2019, Tubeileh and Mader formulated another deal, this time for oil and gas rights owned by Capstone Natural Resource Partners II, L.P. ("Capstone"), in Upton County, Texas. Tubeileh represented that Global Texas could acquire 100% of Capstone's interest for **$7 million**, all in, despite the actual purchase price.

230.    But the actual contractual purchase price for Capstone's 100% working interest was $4,250,000.

231.    The difference between the price Tubeileh provided and the one identified in the Capstone purchase and sale agreement ("Capstone PSA")—$2,750,000—is accounted for in part by "commissions" Tubeileh agreed to pay himself and others on the deal, demonstrated by a letter **Tubeileh wrote to himself** on September 28, 2019:

September 28, 2019

Bernard Tubeileh
1709 Water Lily Drive
Southlake, Texas 76092

Re: Commission

Dear Mr Tubeileh,

Global Oil & Gas Texas LLC (hereinafter referred to as "GOGTX") has agreed to purchase up to with 100% of the Upton County Properties ("Upton Assets") from Capstone Natural Resources Partner II (hereinafter referred to as "Capstone"). GOGTX has agreed to the amount of US$7,000,000 as the total consideration (hereinafter referred to as the "Consideration") for purchasing the Upton Assets. GOGTX and Capstone have executed or will execute a Purchase and Sales Agreement (hereinafter referred to as "PSA") with regard to the acquisition of the Upton Assets. Bernard Tubeileh is the Manager of GOGTX and has executed or will be executing the PSA on behalf of GOGTX. GOGTX has assigned or attributed parts of this acquisition to third parties which have agree to pay certain commissions. GOGTX acknowledges and agrees that a total commission in the amount of US$2150000 (hereinafter referred to the "Commission"), as part of the Consideration, will be paid out to Bernard Tubeileh within three business of executing the PSA. IF GOGTX is unable to pay out the Commission within three business days, the Commission can be paid out in ten equal Commission installments each over the ten months following the Scheduled Closing as stated in the PSA. The unpaid balance of the Commission will carry an interest of 0.8% per month. GOGTX has the right to pay down the unpaid balance of the Commission at any time during the ten months.
The pay-out of the Commission has been approved by Dr Detlef Mader who is the Chief Executive Officer of Global Oil & Gas AG which owns 100% of GOGTX.

Very Truly yours,

Bernard Tubeileh
*Manager, Global Oil & Gas Texas, LLC*

(**Exhibit 22**, 9/28/2019 Letter.)

232.    Of the difference between the $7 million price conveyed versus the $4,250,000 actually paid under the Capstone PSA, the balance largely went to funding illicit commissions.

233.    As a result of this arrangement, Tubeileh received a $2,150,000 commission—**30% of the purported deal price**—and Huddleston got $440,000. Beyond this, Dee Martinez and Huddleston each received carried working interest—their cost to invest was paid by the Global U.S. Subsidiaries and any profit from those wells would have diverted to them.

234.    In reality, Tubeileh and Huddleston were owed *zero* commission for this deal; the letter, therefore, constitutes mail or wire fraud because the letter was intended to make it appear as though Global Texas—and Dr. Mader—approved the commissions. 18 U.S.C. § 1341; 18 U.S.C. § 1343.

235.    On November 8, 2019, and November 11, 2019, Huddleston received two wire transfers that Tubeileh fraudulently caused the Global U.S. Subsidiaries to make, totaling $440,000, for his commission related to the Capstone deal.

236.    On February 6, 2020, Tubeileh fraudulently caused the Global U.S. Subsidiaries to pay Bryant-Link Company, LLC, a $23,000 commission for the Capstone project.

237.    Tubeileh fraudulently caused some of his commission to be paid up front, and then claimed he was owed the balance from the Global U.S. Subsidiaries.

### B.    West Virginia.

238.    In February 2021, Tubeileh fraudulently caused Global Oklahoma to pay Tubeileh and Huddleston commissions related to Global Oklahoma's purchase of 77.5 net mineral acres, for $435,000, from Louisiana Offshore, one of Huddleston's companies, in Ritchie County, West Virginia.[9]

239.    On top of the purchase price, Tubeileh caused Global Oklahoma to pay a $27,500 commission to Huddleston and a $172,000 commission to Tubeileh—**nearly a 40% commission**. There is no basis in fact for either of these commissions and the email from Tubeileh purporting to authorize these commissions constitutes wire fraud. 18 U.S.C. § 1343. (**Exhibit 23**, 2/22/2021 Emails, Tubeileh and Land.)

240.    Because Tubeileh claimed the payment was immediately due—manufacturing urgency and funding needs—and Tubeileh knew Global Oklahoma did not have that much cash on hand, Tubeileh caused Global Oklahoma to borrow $435,000 from Sinostar and pay it back "at the end of the month" after the Global U.S. Subsidiaries' lender sent more funds. (**Ex. 23**.)

241.    On information and belief, on or about February 22, 2021, Tubeileh caused Sinostar to pay Tubeileh, by either wire or check, $172,500. These funds ultimately transferred from

---

[9] This transaction is subject to pending litigation in the United States District Court for the Northern District of West Virginia, based on allegations that an initial transfer of mineral interests in which Huddleston was involved was effectuated through the forgery of a deceased woman's signature. *See M&M Land Consulting, LLC v. Lorentz*, No. 1:23-cv-54-TSK (N.D.W. Va.) (filed June 21, 2023).

Sinostar to Tubeileh were procured by fraud through the Sham Advisory Fee Scheme or the Self-Dealing Loan Scheme and therefore constitute money laundering. 18 U.S.C. § 1956(a)(1)(A)(i); 18 U.S.C. § 1956(a)(1)(B)(i).

242.    On or about February 22, 2021, Tubeileh fraudulently caused Global Oklahoma to pay Huddleston $27,500 via check.

243.    This "commission" payment to Huddleston had no basis in fact and no legitimate business justification. Because the "commission" was unjustified, the instruction to complete the wire for that purpose constituted wire fraud. 18 U.S.C. § 1343.

244.    On February 23, 2021, Tubeileh fraudulently caused Global Oklahoma to repay Sinostar $435,000, plus $1,000 in interest.

### C.    Kentucky.

245.    Tubeileh also caused Global Texas to pay commission to Huddleston related to the Blackhorn project discussed below.

246.    On April 19, 2021, shortly after Tubeileh agreed on behalf of Global Texas to drill with Blackhorn in Kentucky, Tubeileh sent Lori Land an email instructing her to issue a $10,000 "commission" check to Huddleston for "the Kentucky drilling deal." (**Exhibit 24**, 4/19/2021 Emails, Tubeileh and Land.) This email instruction constitutes wire fraud because it was done with the intent to appear as though Huddleston was entitled to such "commissions," when in fact the opposite was true. 18 U.S.C. § 1343.

247.    On April 19, 2021, Tubeileh fraudulently caused Global Oklahoma to pay Huddleston $10,000 via check.

248.    The full scope and breadth of the Commissions Scheme—because of Tubeileh's fraud and concealment of the same, with the assistance of Dr. Mader and others—was not known to the Global U.S. Subsidiaries until after Tubeileh's resignation in 2023.

### THE BLACKHORN INVESTMENT

249.    In April 2021—stemming from a Las Vegas meeting between Tubeileh, Huddleston, and Blackhorn's representative, Grant Norwood—Tubeileh identified an oil and gas investment where he could put his years of fraudulent schemes to work all at once: the Blackhorn investment.

250.    In practice, the Blackhorn investment—setting to one side Blackhorn USA's and Blackhorn Group's breaches of their fiduciary duties to the Global U.S. Subsidiaries—involved two schemes, orchestrated by Tubeileh for his personal benefit and the benefit of his co-conspirators and to the detriment of the Global U.S. Subsidiaries: (1) the Overriding Royalty Scheme and (2) the Carried Working Interest Scheme.

### A.    The Mechanics of the Blackhorn Investment

251.    In an April 6, 2021 email, Tubeileh informed Mader of oil investment opportunities with Blackhorn Group, asserting that three existing wells were producing 180–300 Barrels of Oil Equivalent Per Day ("BOEPD"), and that reserves were estimated at about 300,000–350,000 Barrels of Oil Equivalent ("BOE") per source. Tubeileh represented the Authorization for Expenditure ("AFE") costs per source were $1.064 million, plus commissions and other expenses. Mader, in a one-line email, dutifully approved without hesitation.

252.    Tubeileh offered that Global Texas could purchase an 8% interest in these wells at $1.35 million for the first ten sources.

253.    With no apparent basis, Tubeileh claimed in the same April 6, 2021 email to Mader that Tubeileh would have a 3%–5% Carried Working Interest and a 0.5%–0.85% ORRI on this project. Mader did not question these claims.

254.    The assertions about Tubeileh's carried working interest and ORRIs, communicated to Mader via email, were intended by Tubeileh as part of his scheme to defraud the

Global U.S. Subsidiaries by means of false or fraudulent pretenses and constitute wire fraud. 18 U.S.C. § 1343.

255.     Tubeileh further stated the U.S. oil industry had overlooked this opportunity and that Blackhorn had discovered a "gold pit" that Global Texas could get in on and even receive a share of the already drilled sources.

256.     For example, in a later email sent on July 12, 2021, Tubeileh informed Mader that Global Texas was poised to expand its holdings in the Blackhorn wells; that the Toothacre #2 well was producing 150–200 barrels of oil per day; and that Blackhorn Group would offer buy-in for the existing well, Toothacre #1, which was producing 110 barrels of oil per day.

257.     On April 16, 2021, Logan Wheat, on behalf of Blackhorn USA, sent Tubeileh a "Proposal for Blackhorn USA Kentucky Acreage Holdings" and the "proposed investment" in Blackhorn USA's "multi-well drilling program."

258.     Blackhorn USA agreed to grant Global Texas a Right of First Refusal ("ROFR") to invest up to a one-eighth (12.5%) interest in every horizontal well and up to a one-half (50%) interest in each vertical well Blackhorn USA would drill as part of the Blackhorn project. (**Exhibit 25**, 4/16/2021 Right of First Refusal.

259.     If Global Texas chose to exercise the Right of First Refusal, Global Texas would purchase a 12.5% working interest in each horizontal well and a 50% interest in each vertical well. If it declined, it would lose the ROFR for all future wells. (**Ex. 25**.)

260.     Wheat signed the letter on behalf of Blackhorn USA; Tubeileh signed on behalf of the Global U.S. Subsidiaries. (**Ex. 25**.)

261.     Around the same time, Blackhorn USA provided the Global U.S. Subsidiaries with a form draft operating agreement, dated May 1, 2021, related to various wells to be drilled in

Hopkins County and Muhlenberg County, Kentucky. (**Exhibit 26**, 5/1/2021 Operating Agreement.)

262.    Wheat executed the Operating Agreement on May 11, 2023, but backdated it to May 11, 2021. (**Ex. 26**.)

263.    When Wheat visited the Global U.S. Subsidiaries offices after Tubeileh's resignation, Blackhorn provided an unsigned copy of the Joint Operating Agreement.

264.    Only after months of back-and-forth with Wheat and Blackhorn's counsel did Blackhorn turn over a version of the Joint Operating Agreement purportedly signed by Tubeileh **two years later**, on May 11, 2023, the same day that Tubeileh resigned from his roles with the Global U.S. Subsidiaries and **three days after** he was stripped of his authority to act on behalf of the Global U.S. Subsidiaries. (**Ex. 26**.)

265.    The purported Joint Operating Agreement under which Blackhorn and the Global U.S. Subsidiaries operated eliminated a records and inspection component, which made discovering Tubeileh's various schemes as it related to the Blackhorn project more challenging because the Global U.S. Subsidiaries had no contractual access to Blackhorn's records:

> 4. <u>Access to Contract Area and Records:</u> Operator shall, except as otherwise provided herein, permit each Non-Operator or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. ~~Operator will furnish to each Non-Operator upon request copies of any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C."~~

(**Ex. 26**.)

266.    There is no explanation why Wheat and Blackhorn or Tubeileh would expressly exclude auditing abilities and rights on a multi-million-dollar investment that Tubeileh falsely represented as one of the Global U.S. Subsidiaries' largest and most profitable investments.

267.    Nor is there any explanation why Blackhorn would proceed with an unsigned Joint Operating Agreement. But at a meeting in Las Vegas, Tubeileh and others determined they would all profit at the expense of the Global U.S. Subsidiaries on this sham project and proceeded with that intent.

### B.    Tubeileh's Blackhorn Investment Schemes

268.    Against this backdrop and with the ROFR and the Joint Operating Agreement in hand (yet unsigned), Tubeileh set to work to put two more schemes into place—the Overriding Royalty Scheme and the Carried Working Interest Scheme—which are shown by the diagram below and explained *infra*, ¶¶ 269–326:



### 1.       The Overriding Royalty Scheme

269.     Tubeileh claimed he received ORRIs, without paying consideration, from Global Texas in every Blackhorn well in which Global Texas elected to participate. This representation was false and part of Tubeileh's scheme to defraud the Global U.S. Subsidiaries based on the false representation that he received ORRIs. 18 U.S.C. § 1343.

270.     In reality, Tubeileh never possessed the ORRIs he represented that he held. First, a company would have no reason to give ORRIs to a salaried employee. Second, Tubeileh never provided Blackhorn with any notification related to the purported transfer or assignment of these ORRIs, which means the operator for the wells had no substantiating paperwork, and there was no obligation to pay out for the ORRIs. Third, on information and belief, Blackhorn has no record of any ORRI transfer to Global Texas, from Global Texas to Tubeileh, or from Tubeileh back to Global Texas.

271.     Regardless, Tubeileh, with Mader's approval, fraudulently caused Global Texas to purchase these made-up ORRIs from him.

272.     In an email thread culminating on September 9, 2021, Tubeileh told Mader the wells in Kentucky were very successful and that Global's own consulting geologist was very satisfied with the results.

273.     Tubeileh further informed Mader that two of the Horizontal Wells (Toothacre #1 and #2) continued to produce about 100–200 barrels of oil per day and that the Vertical Wells should produce about 50–100 barrels of oil per day as soon as they were connected.

274.     Tubeileh then represented that he received the fictitious ORRIs at a 3% share in each Vertical Well and at an 0.8% share in each Horizontal Well. 18 U.S.C. § 1343.

275.     Tubeileh then offered to increase the Global U.S. Subsidiaries' exposure to the Blackhorn wells by selling his fictitious ORRIs to Global Texas for:

    a.   $181,440 for each 3% Vertical Well ORRI; and

    b.   $103,680 for each 0.8% Horizontal Well ORRI.

276.    Tubeileh arrived at these proposed prices by representing that the Vertical Wells were producing 70 barrels per day and the Horizontal Wells are producing 150 barrels per day.

277.    Tubeileh then extrapolated those production volumes over four years at an oil price of $60 per barrel.

278.    Tubeileh represented these prices were conservative and stated that Global Texas would be receiving significant upside potential practically for free.

279.    Tubeileh also suggested that Global U.S. Subsidiaries would not have to finance the purchase of these ORRIs, but rather it could gently finance the purchase price from Global's existing cash flow. The purpose of doing so was not to benefit Global U.S. Subsidiaries, but rather to conceal Tubeileh's ORRI scheme.

280.    On September 9, 2021, Tubeileh and Mader executed a Purchase and Sale Agreement dated September 10, 2021—but retroactively effective April 1, 2021, which predated Global Texas's and Blackhorn's ROFR agreement—under which Global Texas purported to agree to buy ORRIs from Tubeileh at the price of $181,440 for 3% ORRIs in Vertical Wells and $103,860.00 for 0.8% ORRIs in Horizontal Wells ("PSA"). (**Exhibit 27**, 9/9/2021 Purchase & Sale Agreement.)

281.    Under the PSA, Tubeileh obligated Global Texas to pay him for his purported ORRIs ten days after Global Texas elected to participate in a Blackhorn well—up front, unconditionally, and in a lump sum—long before a well would be drilled and producing and the well's actual value could be determined. (**Ex. 27**.)

282.     When Tubeileh returned the executed copy of the PSA to Mader, he sent it from a Sinostar email account. Mader was amused by this and asked Tubeileh if he had begun working for Sinostar "again."

283.     Tubeileh, in an effort to disguise his relationship with Sinostar, denied this and stated that he played no role in Sinostar LLC and that he only had a role with Sinostar GmbH. (**Exhibit 28**, 9/11/2021 Emails, Tubeileh and Mader.)

284.     Under the PSA, every time Global Texas participated in a Blackhorn well, Tubeileh obligated Global Texas to purchase the fictitious ORRIs from him.

285.     Thus, each time Tubeileh elected for Global Texas to participate in a Blackhorn well, he also ensured Global Texas would purchase a fraudulent ORRI from him.

286.     On the evening of September 9, 2021, shortly after Mader returned a countersigned copy of the PSA, Tubeileh emailed Lori Land and instructed her to begin preparing ORRI payments to Tubeileh. (**Exhibit 29**, 9/9/2021 Email, Tubeileh and Land.)

287.     This email from Tubeileh, having devised the ORRI Scheme to defraud the Global U.S. Subsidiaries, constitutes wire fraud. 18 U.S.C. § 1343.

288.     Although Tubeileh proposed the sale of the ORRIs to Mader, Tubeileh told Land that Mader approached him and requested that he "sell the Overriding Royalty, they agreed to give me in March 2021 before wells were drilled, back to Global." (**Ex. 29**.)

289.     Tubeileh having devised the ORRI Scheme to defraud the Global U.S. Subsidiaries makes each transaction under the PSA an individual wire fraud. 18 U.S.C. § 1343.

290.     Tubeileh's statement to Land that the ORRIs were assigned to him in March 2021 contradicts other statements he made to others, to whom he represented that the ORRIs were orally assigned to him in July 2020 and in writings on April 16 and April 17, 2021. In fact, Tubeileh admitted it would be difficult to substantiate assignment of the ORRIs to him.

291.     Blackhorn had no separate knowledge of any such ORRI transfer.

292.     Thus, after approaching Mader with the proposed sale of the ORRIs and Mader signing the PSA, Tubeileh immediately changed his story and represented to Land that he was forced to agree to the PSA.

293.     Tubeileh told Land that Mader had offered to buy the ORRIs at the prices in the PSA when, in fact, Tubeileh set his own price.

294.     Tubeileh further told Land that "Global's Net Revenue Interest in the horizontal wells will increase from c. 6.0% to c. 6.8% and from 22.5% to 25.5% in all vertical wells (the last checks probably erroneously included the ORRI). I have (had to) agreed to this offer, and Dr[.] Mader insisted to quickly sign a simple PSA (see attached)."

295.     Tubeileh's statement that the last checks received by Global Texas "probably erroneously" included the ORRI is highly suspicious and suggests Tubeileh was never assigned the ORRIs in the first place, and thus he sold Global Texas rights it already possessed.

296.     On information and belief, Tubeileh was never assigned ORRIs in Global Texas's interests in the Blackhorn wells.

297.     The purported grant of ORRIs from Global Texas to Tubeileh in 2021 was never recorded.

298.     The purported grant of ORRIs from Tubeileh to Global Texas in 2021 was never recorded.

299.     Further, Tubeileh was on both sides of the transaction. If the ORRIs existed, in exchange for receipt of the $7 million Tubeileh ultimately caused Global Texas to pay him for the purported ORRIs, he should have advised Blackhorn that Global Texas owned the ORRIs.

300.     In a September 9, 2021 email to Land, Tubeileh instructed Land to arrange to pay him $1,658,880 for ORRI sales retroactively triggered by the PSA and additional ORRI sales

anticipated in the following week. This email from Tubeileh, having devised the ORRI Scheme to defraud the Global U.S. Subsidiaries, constitutes wire fraud. 18 U.S.C. § 1343.

301.    On September 22, 2021, Tubeileh confirmed the ORRIs subject to the PSA had been transferred to Global Texas. This was false. This email from Tubeileh, having devised the ORRI Scheme to defraud the Global U.S. Subsidiaries, constitutes wire fraud. 18 U.S.C. § 1343.

302.    In reality, no ORRI rights were transferred to Global Texas or Global Oklahoma. Neither Global Texas nor Global Oklahoma ever received ORRI payments from Blackhorn.

303.    By agreements dated November 12, 2021, and September 9, 2022, Tubeileh and Mader signed amendments to the PSA, which fraudulently **increased** the price of Tubeileh's ORRI payments from Global Texas and obligated Global Texas to purchase ORRIs from Tubeileh in proportion to Global Texas's level of investment in the Blackhorn wells.

304.    With the Overriding Royalty Scheme in place, between April 2021 and April 2023, Tubeileh signed AFEs exercising Global Texas's options in **forty-five** Blackhorn wells.

305.    Drilling forty-five wells at this pace with such limited production and information was commercially unreasonable and contrary to industry best practices.

306.    Tubeileh ensured that Global Texas continued to execute AFEs to participate in the Blackhorn wells in an unreasonably expedited manner through the structure of the Blackhorn ROFR, which provided Global Texas only ten days to decide whether to participate in any given investment.

307.    Further, the structure of the Blackhorn ROFR required that Global Texas participate in *every* opportunity presented or else lose its right of first refusal for future Blackhorn wells, which Tubeileh presented as a "once in a lifetime opportunity."

308.    Based on Tubeileh causing Global Texas to participate in forty-five Blackhorn Wells between April 2021 and April 2023, Tubeileh caused Global Texas to pay him **$7,260,120 for ORRIs that did not exist**:

| Well | ORRI Payment |
|------|--------------|
| Toothacre 1 | $103,680.00 |
| Kirkpatrick 1 | $103,680.00 |
| Kirkpatrick 2 | $103,680.00 |
| Toothacre 2 | $103,680.00 |
| Bastin 1 | $103,680.00 |
| Toothacre 3 | $181,440.00 |
| Toothacre 4 | $181,440.00 |
| Toothacre 5 | $181,440.00 |
| Toothacre 6 | $103,680.00 |
| Higgins 1 | $103,680.00 |
| Toothacre 7 | $181,440.00 |
| Skipworth 1 | $103,680.00 |
| Skipworth 2 | $103,680.00 |
| Skipworth 3 | $103,680.00 |
| Toothacre 10 | $103,680.00 |
| Toothacre 11 | $103,680.00 |
| Skipworth 6 | $181,440.00 |
| Skipworth 5 | $103,680.00 |
| Nance #1 | $103,680.00 |
| Bickett 1 | $103,680.00 |
| Bickett 2 | $103,680.00 |
| Phaup 1 | $181,440.00 |
| Phaup2 | $181,440.00 |
| Skipworth 7 | $181,440.00 |
| Skipworth 8 | $103,680.00 |
| Austin 2 | $181,440.00 |
| Austin 3 | $181,440.00 |
| Austin 4 | $181,440.00 |
| Hunt 3 | $181,440.00 |
| Hunt 4 | $181,440.00 |
| Hunt 5 | $181,440.00 |
| Austin 1 | $129,600.00 |
| Allen 1 | $57,600.00 |
| Fatheree 1 | $216,000.00 |
| Fatheree 2 | $216,000.00 |
| Wood 1 | $459,000.00 |
| Hunt 1 | $181,440.00 |

| | |
|---|---|
| Hunt 2 | $181,440.00 |
| Skipworth 9 | $226,800.00 |
| Skipworth 10 | $226,800.00 |
| Skipworth 11 | $226,800.00 |
| Blackhorn 2 | $226,800.00 |
| Hunt 6 | $181,440.00 |
| Hunt 7 | $181,440.00 |
| Toothacre 9 | $103,680.00 |
| **TOTAL** | **$7,260,120.00** |

309.    In sum, Global Texas paid over $21 million to invest in the Blackhorn wells (including investment costs and payments to Tubeileh for alleged ORRIs), but in over two years, Global Texas has received less than $1 million in net distributions from these wells, which resulted in overall financial losses on the Blackhorn project.

### 2.    The Carried Working Interest Scheme

310.    Separate from the Overriding Royalty Scheme, Tubeileh also reassigned Global Texas's working interest in the Blackhorn wells to himself and Huddleston through the Carried Working Interest Scheme.

311.    Recall that Global Texas, when it elected to participate in a Blackhorn well, purchased a working interest of 50% in all vertical wells and 12.5% in all horizontal wells. Global paid the entire portion of these purchases.

312.    On April 27, 2021, Tubeileh caused Global Texas to assign .5% of Global Texas's working interest in the Blackhorn horizontal wells and 1% of Global Texas's working interest in the Blackhorn vertical wells to Huddleston as carried working interest.[10]

---

[10] Carried working interest is a fractional, non-possessory interest carved out of a working interest that is exclusive from all costs of development or operation, usually for a set period of time known as the "carry period." Once the "carry period" ends, the carried interest will bear the development and operating costs and share in any subsequent production according to whatever the agreed sharing ratio may be.

313.     This transaction initiated by Tubeileh, having devised the Carried Working Interest Scheme to defraud the Global U.S. Subsidiaries, constitutes wire fraud. 18 U.S.C. § 1343.

314.     Huddleston then, in turn, transferred part of his carried working interest to his network: Dee Martinez and/or the Dee Martinez Family Trust Limited Partnership. Huddleston also transferred some of his carried working interest to Tubeileh's cabinet maker, Wayne Anchikoski.

315.     Also on April 27, 2021, Tubeileh caused Global Texas to assign 4% of Global Texas's working interest in the horizontal wells and 19% of Global Texas's working interest in the vertical wells to Tubeileh as carried working interest.[11]

316.     This transaction initiated by Tubeileh, having devised the Carried Working Interest Scheme to defraud the Global U.S. Subsidiaries, constitutes wire fraud. 18 U.S.C. § 1343.

317.     On information and belief, this agreement was signed on or about April 27, 2021. A signed version, dated November 12, 2021, also exists. Regardless, the assignment was retroactive such that it encompassed every Blackhorn well. (**Exhibit 30**, 11/12/2021 CWI Assignment.)

318.     As a result of Tubeileh's assignments of Global Texas's working interests, Global Texas's *actual* working interest in the Blackhorn wells was 8% for horizontal wells and 30% for vertical wells.

319.     That is, although Global Texas provided all the financial capital to secure 12.5% interest in the horizontal wells and 50% interest in the vertical wells, Global Texas only received 8% and 30% interests, respectively.

---

[11] Despite several versions of this assignment, documents Blackhorn recorded as part of the public record related to these wells indicate Global carried 8% in horizontal wells, consistent with Tubeileh's original assignment of 4% to himself and .5% to Huddleston.

320.   In setting up these assignments of Global Texas's working interests in the Blackhorn wells, every time Global Texas elected to exercise its ROFR, Tubeileh and Huddleston were *automatically* assigned part of Global Texas's working interest at *no cost and without any risk*.

321.   As a result, Global Texas's share of profits from the Blackhorn wells was greatly reduced, despite Global Texas bearing all the costs:

| Well | Global's Purchased Working Interest | Global Working Interest Cost | Global's Diluted Working Interest | Tubeileh Working Interest | Huddleston Working Interest | Authorization for Expenditure Date |
|---|---|---|---|---|---|---|
| Toothacre 1 | 12.5% | $215,000.00 | 8% | 4% | 0.5% | 1/12/2021 |
| Kirkpatrick 1 | 12.5% | $133,000.00 | 8% | 4% | 0.5% | 4/26/2021 |
| Kirkpatrick 2 | 12.5% | $133,000.00 | 8% | 4% | 0.5% | 4/26/2021 |
| Toothacre 2 | 12.5% | $133,000.00 | 8% | 4% | 0.5% | 4/26/2021 |
| Bastin 1 | 12.5% | $149,625.00 | 8% | 4% | 0.5% | 4/27/2021 |
| Toothacre 3 | 50.0% | $323,765.00 | 30% | 19% | 1% | 4/27/2021 |
| Toothacre 4 | 50.0% | $323,765.00 | 30% | 19% | 1% | 4/27/2021 |
| Toothacre 5 | 50.0% | $323,765.00 | 30% | 19% | 1% | 4/27/2021 |
| Toothacre 6 | 12.5% | $160,300.63 | 8% | 4% | 0.5% | 5/19/2021 |
| Higgins 1 | 12.5% | $149,625.00 | 8% | 4% | 0.5% | 7/12/2021 |
| Toothacre 7 | 50.0% | $364,235.00 | 30% | 19% | 1% | 7/30/2021 |
| Skipworth 1 | 12.5% | $177,525.70 | 8% | 4% | 0.5% | 9/13/2021 |
| Skipworth 2 | 12.5% | $177,525.00 | 8% | 4% | 0.5% | 9/13/2021 |
| Skipworth 3 | 12.5% | $182,718.98 | 8% | 4% | 0.5% | 11/13/2021 |
| Toothacre 9 | Traded from Toothacre 6 | | | | | |
| Toothacre 10 | 12.5% | $185,039.30 | 8% | 4% | 0.5% | 12/19/2021 |
| Toothacre 11 | 12.5% | $188,048.67 | 8% | 4% | 0.5% | 1/4/2022 |
| Skipworth 6 | 50.0% | $400,550.00 | 30% | 19% | 1% | 1/18/2022 |
| Skipworth 5 | 12.5% | $189,629.30 | 8% | 4% | 0.5% | 1/28/2022 |
| Nance #1 | 12.5% | $189,629.30 | 8% | 4% | 0.5% | 2/14/2022 |
| Bickett 1 | 12.5% | $198,337.50 | 8% | 4% | 0.5% | 3/7/2022 |
| Bickett 2 | 12.5% | $198,337.50 | 8% | 4% | 0.5% | 3/12/2022 |
| Phaup 1 | 50.0% | $400,550.00 | 30% | 19% | 1% | 3/24/2022 |
| Phaup 2 | 50.0% | $400,550.00 | 30% | 19% | 1% | 3/24/2022 |
| Skipworth 7 | 50.0% | $400,550.00 | 30% | 19% | 1% | 3/24/2022 |
| Skipworth 8 | 12.5% | $205,618.36 | 8% | 4% | 0.5% | 5/19/2022 |
| Austin 2 | 50% | $441,674.37 | 30% | 19% | 1% | 6/13/2022 |
| Austin 3 | 50% | $441,674.37 | 30% | 19% | 1% | 6/13/2022 |

| Austin 4 | 50% | $441,674.37 | 30% | 19% | 1% | 6/13/2022 |
|---|---|---|---|---|---|---|
| Hunt 3 | 50.0% | $403,067.18 | 30% | 19% | 1% | 9/7/2022 |
| Hunt 4 | 50.0% | $403,067.18 | 30% | 19% | 1% | 9/7/2022 |
| Hunt 5 | 50.0% | $403,067.18 | 30% | 19% | 1% | 9/7/2022 |
| Austin 1 | 12.5% | $198,495.70 | 8% | 4% | 0.5% | 9/9/2022 |
| Hunt 1 | 50.0% | $413,614.06 | 30% | 19% | 1% | 12/1/2022 |
| Hunt 2 | 50.0% | $413,614.06 | 30% | 19% | 1% | 12/1/2022 |
| Skipworth 9 | 50.0% | $405,598.43 | 30% | 19% | 1% | 3/16/2023 |
| Skipworth 10 | 50.0% | $400,437.50 | 30% | 19% | 1% | 3/24/2023 |
| Skipworth 11 | 50.0% | $400,437.50 | 30% | 19% | 1% | 3/24/2023 |
| Blackhorn 2 | 50.0% | $400,437.50 | 30% | 19% | 1% | 4/24/2023 |
| Hunt 6 | 50.0% | $404,656.25 | 30% | 19% | 1% | 4/24/2023 |
| Hunt 7 | 50.0% | $404,656.25 | 30% | 19% | 1% | 4/24/2023 |

322.     As a result of the assignment of carried working interests for the Blackhorn wells—for which Tubeileh paid nothing—in 2022 Tubeileh fraudulently reaped $327,823.58 in income from his carried working interest.

323.     Tubeileh continues to receive income from these interests today. On information and belief, as a result of the Carried Working Interest Scheme, Tubeileh realized profits on the Blackhorn wells in 2021, 2023, and 2024 as well.

324.     As a result of the Carried Working Interest Scheme—for which Huddleston paid nothing—on information and belief, Huddleston received payments in 2021, 2022, 2023, and/or 2024.

325.     The carried working interests and the revenue generated by them, if any, are lost profit to the Global U.S. Subsidiaries.

326.     On information and belief, the Global U.S. Subsidiaries also paid all or a portion of Blackhorn's cost for each well.

### TUBEILEH SELLS THE GLOBAL U.S. SUBSIDIARIES' ASSETS TO FURTHER THE OVERRIDING ROYALTY AND CARRIED WORKING INTEREST SCHEMES

327.    On March 8, 2023, Tubeileh represented that interests Global Texas owned in Upton County, Texas (the Upton Wells), were poor performers and that Global Texas should dispose of them to pursue more investment with Blackhorn in Kentucky.

328.    As it were, Tubeileh knew the perfect buyer: Grant Norwood, who had recently left Blackhorn, and his new company NEC.

329.    A short time later that day, after Tubeileh and Mader spoke by phone, Mader emailed Tubeileh agreeing to dispose of the Upton Well interests and stated that this matter should remain between the two of them, without informing Global AG or the Supervisory Board of Global AG.

330.    This arrangement particularly breached various loan obligations, as Global Texas's interests in the Upton Wells were part of a collateral pool Global Texas pledged to secure loan financing, which Tubeileh and Mader knew or should have known.

331.    On April 19, 2023, Norwood—who had previously worked for Blackhorn—emailed Tubeileh stating, "I am ready to proceed with purchasing the Upton County assets for $1,500,000.00, with an effective date of 4/1/23. I propose we split April's net proceeds 50-50. Please send me an assignment or let me know if I need to create one. Also, please send me wire instructions, so I can send out a wire transfer tomorrow." (**Exhibit 31**, 4/19/2023 Emails, Tubeileh and Norwood.)

332.    Despite Norwood's offer to send the wire the next day, the assignment was not entered into until April 27, 2023. On information and belief, there was not an advanced draft of the assignment.

333.     Also on April 19, 2023, when confirming Global Texas's ownership interests in Upton County, Tubeileh told Norwood that Global Texas's last PV10 valuation[12] of these interests was $3 million. That is, the Upton Wells were valued at twice what Tubeileh agreed to sell them. (**Ex. 31**.)

334.     Despite selling Global Texas's Upton interests far below their market value, Tubeileh benefitted from this sale because he took an unauthorized 7%—$105,000—commission.

335.     On information and belief, for no legitimate reason, Huddleston received a $300,000 commission related to this sale.

336.     In addition, Tubeileh intended to use the $1.5 million in proceeds to further fund acquisitions in the Blackhorn project, which would require the Global U.S. Subsidiaries to purchase additional purported ORRIs from Tubeileh under the PSA and steer more carried working interest to Tubeileh and Huddleston.

### BLACKHORN'S BREACH OF ITS FIDUCIARY DUTIES TO THE GLOBAL U.S. SUBSIDIARIES

337.     Regardless of if and when the Joint Operating Agreement ("JOA") was executed, the Global U.S. Subsidiaries and Blackhorn proceeded as joint venturers in the Blackhorn wells. Part and parcel with that joint venture, either under the JOA or common law, Blackhorn and the Global U.S. Subsidiaries owed each other fiduciary duties.

338.     Under the ROFR and PSA discussed above, throughout 2021, 2022, and 2023, Blackhorn provided dozens of AFEs for wells in Kentucky and several more for wells in Illinois; Global Texas, at Tubeileh's direction, elected to participate in every single one.

339.     The rate at which Blackhorn issued AFEs was commercially unreasonable; normal practice in the oil and gas industry is to drill a few exploratory wells and wait to see if there are

---

[12] This is an estimated present value of future oil and gas revenues and net estimated direct expenses, at an annual discount rate of 10%.

positive returns. Blackhorn instead drilled more than **forty wells** in **two-and-a-half years**, many of which never produced a drop of oil. This investment made sense for Tubeileh and his co-conspirators because they received payments and commissions with no risk because they did not have to front any expense or risk that any well might not produce; they profited regardless.

340.    But as soon as Tubeileh's employment with the Global U.S. Subsidiaries ended, Blackhorn began to find ways to wind down or offload its Kentucky drilling operation because the project was not profitable and had not been from the start.

341.    Instead, Blackhorn remained interested only so long as Tubeileh was at the helm of the Global U.S. Subsidiaries and able to steer millions of dollars to Blackhorn for investments that were not worth even 1/10th of what Blackhorn charged the Global U.S. Subsidiaries.

342.    In mid-2023, the Global U.S. Subsidiaries requested to audit Blackhorn's books and records related to the April 16, 2021 Joint Operating Agreement.

343.    Attorneys for the Global U.S. Subsidiaries visited Blackhorn's office, where they were met with security guards, threats, and obstruction from Wheat.

344.    Because of Wheat's obstruction, the Global U.S. Subsidiaries were only able to make a partial audit of Blackhorn's relevant books and records. The Global U.S. Subsidiaries have not been invited back.

345.    In June 2023, Blackhorn conveyed that the Global U.S. Subsidiaries had lost their Right of First Refusal for additional investment in the Blackhorn Project.

346.    Then, in July 2023, without informing the Global U.S. Subsidiaries, Blackhorn recorded various mineral rights in favor of Tubeileh and Huddleston in Kentucky. (**Exhibit 32**, 7/21/2023 Recorded Assignment to Tubeileh.) In addition, Blackhorn offered Huddleston and his company, Louisiana Offshore, a lower price than it offered Global for the same mineral interests.

347.    Late last year, Blackhorn finally produced a signed Joint Operating Agreement, which it claimed Tubeileh signed *after* he resigned his positions with the Global U.S. Subsidiaries.

### THE IMMIGRATION FRAUD SCHEME

348.    On July 29, 2017, Tubeileh signed an employment agreement with Global Oklahoma and Global AG ("2017 Employment Agreement").

349.    In his role as Manager of Global AG's U.S. subsidiaries, Tubeileh acted as their sole officer, and he was solely in charge of business development, negotiating deals, binding the companies to transactions, and reporting information and results to Global AG. Tubeileh also instructed subordinate, back-office employees to fund the deals that Tubeileh entered into on behalf of the Global U.S. Subsidiaries.

350.    The 2017 Employment Agreement set Tubeileh's gross salary at $12,500 per month.

351.    Despite the 2017 Employment Agreement running through the end of 2020, in April 2019, Tubeileh requested that Mader, on behalf of the Global U.S. Subsidiaries, extend his employment term by five years.

352.    Tubeileh and Mader conspired in 2019 to create a new employment agreement with the Global U.S. Subsidiaries so that Tubeileh could apply for an E-2 visa. Both did so with full knowledge that Tubeileh's 2017 Employment Agreement had not expired.[13]

353.    Tubeileh and Mader agreed to a five-year extension of Tubeileh's employment agreement so that Tubeileh could represent to the United States Government that he had secured long-term employment in order to support an E-2 Visa application.

---

[13] A copy of this Complaint will be provided to the United States Immigration and Customs Enforcement.

354.     On information and belief, the United States requires that the investment funds identified on an E-2 Visa application be identified to ensure that they were not obtained through illegal or criminal activities.

355.     Tubeileh's companies, Jamalabox and Sinostar, were engaged in the fraudulent activities described here. On information and belief, Tubeileh did not have non-criminally derived investment funds. As such, Tubeileh's E-2 Visa was fraudulently obtained and based on a sham employment contract.

356.     Based on Tubeileh's employment agreement that was in effect at the time he made his E-2 Visa application, his monthly salary was approximately $12,500—which is $150,000 per year. That is the only legitimate money he had or was entitled to; everything else was ill-gotten gains.

357.     Mader and Tubeileh signed this new employment agreement between Tubeileh, Global Oklahoma, and Global AG, at the end of March 2019, with an effective date of April 1, 2019. (**Exhibit 33**, 3/31/2019 Employment Agreement.)

358.     The 2019 Employment Agreement purported to extend Tubeileh's term of employment through December 31, 2024, but otherwise contained terms similar to the 2017 Employment Agreement. Mader and Tubeileh, based on their illicit side agreement, knew the only real purpose of the 2019 Employment Agreement was so Tubeileh could apply for an E-2 work visa. (**Ex. 33**.)

### OTHERS WHO BENEFITTED FROM TUBEILEH'S SCHEMES

359.     Beyond Tubeileh, Huddleston, Barnett, and Mader (among others), there are several other individuals who realized financial benefits from Tubeileh's schemes.

A. **Chris Christenson**

360.     Chris Christenson is or was, on information and belief, a member, shareholder, officer, and/or director of both CA Portfolio Management and CA Funds Group.

361.     At various points throughout Tubeileh's carrying on of the Schemes discussed above, Christenson assisted Tubeileh, Huddleston, and others in carrying out certain components of the Sham Advisory Fee Scheme, discussed above.

362.     On information and belief, Christenson was instrumental in facilitating the fraudulent payments from the Global U.S. Subsidiaries to CA Portfolio Management and CA Funds Group and, similarly, directed the laundering of those fraudulently obtained funds to Huddleston and others, as discussed above. *See supra* ¶¶ 68, 72–73, 75, 101–03, 107–08, 110–11, 115–17, 125–128, 138, 140, 144–45.

363.     Christenson aided and abetted or helped facilitate the fraudulent transfer of funds from the Global U.S. Subsidiaries to CA Portfolio Management and CA Funds Group, and then further laundered or aided in laundering that money to Huddleston and others for Huddleston's benefit.

364.     Christensen, on information and belief, has or had a close personal relationship with Huddleston.

365.     Beyond this, Christenson was also intimately involved with several deals in which he took personal interest or interest on behalf of CA Portfolio Management or CA Funds Group, including the Coffield investment (*see supra* ¶ 170), among others.

366.     Third parties described Christenson as a "close advisor" to Tubeileh.

367.     Tubeileh referred to Christenson as the Global U.S. Subsidiaries' "legal counsel" and at other times as "internal counsel," despite the fact that Christenson did not hold and never has held any such role as it relates to the Global U.S. Subsidiaries.

368.     At all times material, Christenson knew or should have understood the extent and scope of Tubeileh's fraudulent schemes and Christenson did in fact play a major role in facilitating them, including the efforts by Tubeileh and Huddleston to avoid Huddleston's bankruptcy debts.

### THE BEGINNING OF THE END

**A.     Tubeileh Begins Cashing Out**

369.     Sensing that his various Schemes were coming to light, in mid-2022 and through his resignation in May 2023, Tubeileh began to cash out, both on his own behalf and on behalf of Jamalabox and Sinostar.

370.     On May 25, 2022, Tubeileh informed Land that he had sold his ORRIs in all Hardeman County wells (including Gilliam No. 1-H) to Sinostar and instructed her to set up wire transfers to Sinostar to reflect the sale of these ORRIs, despite the fact that Land did not work for Tubeileh personally or for Sinostar.

371.     On June 1, 2022, Tubeileh executed a purchase and sale agreement with Sinostar for his ORRIs in the Hardeman Project, as well as any future rights Tubeileh may obtain to ORRIs for wells drilled by the Global U.S. Subsidiaries, in exchange for $687,500. Tubeileh signed the purchase and sale agreement on behalf of himself, and John Barnett signed on behalf of Sinostar.

372.     On February 22, 2023, Tubeileh caused Global Oklahoma to purchase from Sinostar, for $150,000, all of Sinostar's ORRIs in the Hardeman Project, as well as any future rights to ORRIs Sinostar may obtain for wells in which the Global U.S. Subsidiaries became involved. Mader signed this agreement on behalf of Global Oklahoma; Tubeileh signed on behalf of Sinostar.  (**Exhibit 34**, 2/22/2023 Purchase and Sale Agreement.)

373.     The same day, Sinostar then sold that same ORRI interest to Global Texas for $150,000. Tubeileh signed on behalf of Sinostar; Mader signed for Global Oklahoma.

374.    In early 2023, Tubeileh also instructed Land to expedite $680,400 in ORRI payments related to the Blackhorn project to him.

**B.    Global AG Institutes an Audit and Tubeileh Resigns**

375.    In the spring of 2023, the Supervisory Board of Global AG learned that several prior representations, made by Tubeileh to Mader and passed to the Supervisory Board regarding various Global U.S. Subsidiary investments were unsubstantiated or intentionally incomplete or inaccurate.

376.    As a result, Global AG instituted an audit of the Global U.S. Subsidiaries.

377.    Tubeileh staunchly obstructed the audit, denying access to the Global U.S. Subsidiaries' documents and offices.

378.    In a May 9, 2023 email, Tubeileh admitted that he "instructed the IT consultant to ignore" the audit request and the directive that Global Oklahoma create a backup of its email server to preserve evidence.

379.    On May 10, 2023, Global AG emailed Tubeileh to confront him for: (1) seeking to receive a $1.35 million windfall from a potential Wyoming mineral purchase in April 2023; (2) seeking to receive a commission based on this Wyoming deal even after it fell through; and (3) receiving a $1.5 million windfall from Global Texas in connection with Global Texas's $2.2 million investment in mineral deals in Kentucky.

380.    On May 11, 2023, in a letter erroneously dated "March 11th 2023," Tubeileh "resign[ed] from" his positions at the helm of Global Oklahoma and Global Texas. (**Exhibit 35**, 5/11/2023 Resignation Letter.)

381.    That evening, Tubeileh emailed Huddleston, Elliot Doyle, and his tax advisors from his Global AG email account to instruct them that any future email correspondence to him should be directed to his Sinostar email address, bt@sinostar-investments.com.

70

382.    On May 13, 2023, Tubeileh sent an email from his Sinostar email address to his Global AG email address with the subject "Hi" and no body text.

383.    On May 13, 2023, Tubeileh sent another email to his Global AG email address from the Gmail account starto8899@gmail.com, a personal email account Tubeileh maintained associated with one of his pseudonyms, "Hurst Haberico," with the subject "hi" and no body text.

384.    In an effort to hide his illegal activities, Tubeileh then wiped the contents of his company iPhone, which he never connected to the Global U.S. Subsidiaries' servers.

385.    Mader resigned all his positions with the Global U.S. Subsidiaries and Global AG at the end of September 2023.

386.    On December 20, 2023, Mader emailed Tubeileh at his Sinostar and starto8899@gmail.com email addresses and indicated that he would provide Tubeileh positive testimony in proceedings conducted against him in exchange for €50,000.

387.    The Global U.S. Subsidiaries' investigation into the full extent of Tubeileh's various schemes remains ongoing.

### CONCLUSION

388.    In sum, over the course of nearly seven years, Tubeileh and others defrauded the Global U.S. Subsidiaries of millions in monetary assets and millions more in oil and gas interests in the United States. Tubeileh personally enriched himself and his family and, along the way, helped his co-conspirators—Huddleston, Mader, Barnett, Sinostar, Jamalabox, and others—enrich themselves as well.

389.    Through the Sham Advisory Fees Scheme, Jamalabox, Sinostar, CA Portfolio Management, CA Funds Group, Huddleston, and Huddleston's alter ego companies reaped millions or the benefit of millions, procured by fraud and laundered among the co-conspirators, from the Global U.S. Subsidiaries.

390.    Through the Self-Dealing Loan Scheme, Sinostar and Tubeileh—using money that rightfully belonged to the Global U.S. Subsidiaries in the first place—profited off unnecessary and high-interest loans to the Global U.S. Subsidiaries.

391.    Through the Commissions Scheme, Tubeileh and Huddleston blatantly and directly enriched themselves at the expense of the Global U.S. Subsidiaries.

392.    Through the Overriding Royalty Scheme, Tubeileh enriched himself through the "sale" of fictitious ORRIs that neither he, nor the Global U.S. Subsidiaries ever possessed. Instead, Tubeileh's corruption of Mader allowed Tubeileh to steal over $7 million in cash via the Blackhorn project.

393.    Through the Carried Working Interest Scheme, Tubeileh and Huddleston, with Mader's help, used the Blackhorn project to enrich themselves with oil and gas rights that belonged to the Global U.S. Subsidiaries and for which the Global U.S. Subsidiaries paid.

394.    At bottom, the Global U. S. Subsidiaries have been substantially injured in their business and property.

## COUNT 1
### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### 18 U.S.C. § 1962(C)
### (AGAINST TUBEILEH)

395.    Plaintiffs incorporate the above allegations by reference as if fully rewritten here.

396.    This claim arises under Title 18, United States Code Section 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity … ."

397.    At all relevant times, Tubeileh was a "person" within the meaning of Title 18, United States Code Section 1961(3), as he was "capable of holding a legal or beneficial interest in property."

398.    At all relevant times, Tubeileh operated Global Oil & Gas Texas, LLC as an "enterprise" within the meaning of Title 18, United States Code Section 1961(4).

399.    At all relevant times, Tubeileh operated Global Oil & Gas Fields Oklahoma, LLC as an "enterprise" within the meaning of Title 18, United States Code Section 1961(4).

400.    Together, Global Oklahoma and Global Texas constitute the "Global Enterprise" run by Tubeileh.

401.    The Global Enterprise—operated by Tubeileh—conducted and participated in the affairs of the (1) Sham Advisory Fee Scheme; (2) Self-Dealing Loan Scheme; (3) Commissions Scheme; (4) Immigration Fraud Scheme; (5) ORRI Scheme; and (6) Carried Working Interest Scheme, through a pattern of racketeering activity, as defined by Title 18, United States Code Section 1961(5), consisting of many and repeated instances of: wire fraud (18 U.S.C. § 1343), mail fraud (18 U.S.C. § 1341), money laundering (18 U.S.C. § 1956), the use of fraudulently obtained funds (18 U.S.C. § 1957),  fraud on the United States (18 U.S.C. § 371), and fraud related to bankruptcy proceedings (18 U.S.C. § 152), all in violation of Title 18, United States Code Section 1962(c).

402.    Tubeileh, along with his agents and co-conspirators, conducted the affairs of the Global Enterprise and had the common purpose to secure benefits and profit by obtaining access to capital and other property rights that rightfully belong to others and placing it to their own uses through wire fraud, bank fraud, money laundering, fraud related to bankruptcy proceedings, and commercial bribery.

403.     The Global Enterprise engaged in, and its activities affected, interstate and foreign commerce by, among other things, committing wire and mail fraud, unlawfully transferring money, procuring and transferring fraudulently obtained money and other interests that hold monetary value, engaging in bribery, and committing fraud on the United States and the United States Bankruptcy Court.

404.     Tubeileh committed or aided and abetted the commission of at least 166 discrete predicate acts of racketeering activity. The multiple acts of racketeering activity he committed and/or conspired to commit, or aided and abetted in the commission of, were related to each other, extended for several years and, had the Supervisory Board not instituted the audit, posed a threat of further continuing fraudulent activity, and therefore constitutes a "pattern of racketeering activity."

405.     Tubeileh's predicate acts of racketeering under Title 18, United States Code Section 1961(1) include, but are not limited to:

   a.   **Racketeering Act 1 (Wire Fraud, Money Laundering):** On or about July 7, 2017, Tubeileh caused the Global U.S. Subsidiaries to wire $1.2 million to PostOak. On information and belief, PostOak then, under fraudulent pretenses and instruction from Tubeileh, transferred $100,000 of those funds to Jamalabox for non-existent consulting fees. 18 U.S.C. § 1343. Jamalabox then transferred those funds to Huddleston or Sinostar, the latter of which is controlled by Tubeileh and Barnett. All these parties accepted these funds without disclosing the fraudulent nature of the funds or transfer. 18 U.S.C. § 1343; 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i); 18 U.S.C. § 1957(a).

b.  **Racketeering Act 2 (Wire Fraud, Money Laundering):** On or about October 10, 2017, Tubeileh caused the Global U.S. Subsidiaries to wire $1.36 million to PostOak. On information and belief, PostOak then, under fraudulent pretenses and instruction from Tubeileh, transferred $120,000 of those funds to Jamalabox for non-existent consulting fees. 18 U.S.C. § 1343. Jamalabox then laundered those funds to Huddleston or Sinostar, the latter of which is controlled by Tubeileh and Barnett. All these parties accepted these funds without disclosing the fraudulent nature of the funds or transfer. 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i); 18 U.S.C. § 1957(a).

c.  **Racketeering Act 3 (Wire Fraud, Money Laundering):** On or about January 17, 2018, Tubeileh caused the Global U.S. Subsidiaries to, under fraudulent pretenses, wire $858,000 to an account controlled by Jamalabox with an understanding that the funds were for advisory fees. This statement was false and made by wire. 18 U.S.C. § 1343. Jamalabox, controlled by Tubeileh and Barnett, accepted these funds without disclosing that it provided no such services to the Global U.S. Subsidiaries. Those proceeds, procured by fraud, were laundered to Sinostar on January 19, 2018, in the amount of $841,998. 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i); 18 U.S.C. § 1957(a).

d.  **Racketeering Act 4 (Wire Fraud, Money Laundering):** On or about March 23, 2018, Tubeileh caused the Global U.S. Subsidiaries to, under fraudulent pretenses, wire $43,750 to an account controlled by Jamalabox with an understanding that the funds were for advisory fees. This was a false

statement provided by wire. 18 U.S.C. § 1343. Jamalabox, controlled by Tubeileh and Barnett, accepted these funds without disclosing that it provided no such services to the Global U.S. Subsidiaries. Those proceeds, procured by fraud, were laundered to Sinostar on March 26, 2018, evidenced by the receipt of a wire from "JAM001" for $42,750. 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i); 18 U.S.C. § 1957(a).

e. **Racketeering Act 5 (Wire Fraud)**: On or about March 28, 2018, Tubeileh caused the Global U.S. Subsidiaries to, under fraudulent pretenses, wire $23,500 to an account controlled by Sinostar with an understanding that the funds were for advisory fees, which was a false statement made by wire. 18 U.S.C. § 1343. Sinostar, controlled by Tubeileh and Barnett, accepted these funds without disclosing that it provided no such services to the Global U.S. Subsidiaries. 18 U.S.C. § 1343.

f. **Racketeering Act 6 (Mail or Wire Fraud, Money Laundering):** On or about March 30, 2018, Tubeileh caused the Global U.S. Subsidiaries to, under fraudulent pretenses, wire $395,000 to an account controlled by Jamalabox with an understanding that the funds were for consulting fees. This statement was false and made by wire. 18 U.S.C. § 1343. Jamalabox, controlled by Tubeileh and Barnett, accepted these funds without disclosing that it provided no such services without disclosing it to the Global U.S. Subsidiaries. 18 U.S.C. § 1341; 18 U.S.C. § 1343. Those proceeds, procured by fraud, were laundered to Sinostar on April 2, 2018, evidenced by the receipt of a wire from "Jam001" for $385,000. 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i); 18 U.S.C. § 1957(a).

g. **Racketeering Act 7 (Mail or Wire Fraud, Money Laundering):** On or about April 24, 2018, Tubeileh caused the Global U.S. Subsidiaries to, under fraudulent pretenses, wire $500,000 to an account controlled by Jamalabox with an understanding that the funds were for consulting fees. This statement was false and made by wire. 18 U.S.C. § 1343. Jamalabox, controlled by Tubeileh and Barnett, accepted these funds without disclosing that it provided no such services without disclosing it to the Global U.S. Subsidiaries. 18 U.S.C. § 1341; 18 U.S.C. § 1343. Those proceeds, procured by fraud, were laundered to Sinostar on April 25, 2018, evidenced by the receipt of a wire from "JAM001" for $490,000. 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i); 18 U.S.C. § 1957(a).

h. **Racketeering Act 8 (Mail or Wire Fraud, Money Laundering):** On or about June 1, 2018, Tubeileh caused the Global U.S. Subsidiaries to, under fraudulent pretenses, wire $373,000 to an account controlled by Jamalabox with an understanding that the funds were for consulting fees. This statement was false and made by wire. 18 U.S.C. § 1343. Jamalabox, controlled by Tubeileh and Barnett, accepted these funds without disclosing that it provided no such services without disclosing it to the Global U.S. Subsidiaries. Those proceeds, procured by fraud, were laundered to Sinostar on June 4, 2018, evidenced by the receipt of a wire from "JAM001" for $365,000. 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i); 18 U.S.C. § 1957(a).

i. **Racketeering Act 9 (Mail or Wire Fraud, Money Laundering):** On or about July 31, 2018, Tubeileh caused the Global U.S. Subsidiaries to, under fraudulent pretenses, wire $1,100,000 to an account controlled by

Jamalabox with an understanding that the funds were for consulting fees. This statement was false and made by wire. 18 U.S.C. § 1343. Jamalabox, controlled by Tubeileh and Barnett, accepted these funds without disclosing that it provided no such services without disclosing it to the Global U.S. Subsidiaries. Those proceeds, procured by fraud, were laundered to Sinostar on August 1, 2018, evidenced by the receipt of a wire from "JAM001" for $1,100,000.   18   U.S.C.   §§ 1956(a)(1)(A)(i),   (a)(1)(B)(i);   18   U.S.C. § 1957(a).

j.   **Racketeering Act 10 (Mail or Wire Fraud, Money Laundering):** On or about August 1, 2018, Tubeileh caused the Global U.S. Subsidiaries to, under fraudulent pretenses, wire $300,319.76 to an account controlled by Jamalabox with an understanding that the funds were for consulting fees. This statement was false and made by wire. 18 U.S.C. § 1343. Jamalabox, controlled by Tubeileh and Barnett, accepted these funds without disclosing that it provided no such services without disclosing it to the Global U.S. Subsidiaries. Those proceeds, procured by fraud, were laundered to Sinostar on August 2, 2018, evidenced by the receipt of a wire from "JAM001" for $260,319.79.  18   U.S.C.   §§ 1956(a)(1)(A)(i),   (a)(1)(B)(i);   18   U.S.C. § 1957(a).

k.   **Racketeering Act 11 (Mail or Wire Fraud, Money Laundering):** On or about September 20, 2018, Tubeileh caused the Global U.S. Subsidiaries to, under fraudulent pretenses, wire $500,000 to an account controlled by Jamalabox with an understanding that the funds were for consulting fees. This statement was false and made by wire. 18 U.S.C. § 1343. Jamalabox,

controlled by Tubeileh and Barnett, accepted these funds without disclosing that it provided no such services without disclosing it to the Global U.S. Subsidiaries. Those proceeds, procured by fraud, were laundered to Sinostar on September 21, 2018, evidenced by the receipt of a wire from "JAM001" for $490,000. 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i); 18 U.S.C. § 1957(a).

l. **Racketeering Acts 12 and 13 (Mail or Wire Fraud, Money Laundering)**: On or about January 30, 2019, and January 31, 2019, Tubeileh caused the Global U.S. Subsidiaries to, under fraudulent pretenses, wire a total of $500,000 to an account controlled by Jamalabox with an understanding that the funds were for consulting fees. This statement was false and made by wire. 18 U.S.C. § 1343. Jamalabox, controlled by Tubeileh and Barnett, accepted these funds without disclosing that it provided no such services without disclosing it to the Global U.S. Subsidiaries. Those proceeds, procured by fraud, were, on information and belief, laundered to Sinostar. 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i); 18 U.S.C. § 1957(a).

m. **Racketeering Act 14 (Mail or Wire Fraud, Money Laundering)**: On or about January 17, 2018, Tubeileh caused the Global U.S. Subsidiaries to, under fraudulent pretenses, wire $450,000 to an account controlled by CA Portfolio Management with an understanding that the funds were for consulting fees, which was false. 18 U.S.C. § 1341; 18 U.S.C. § 1343. CA Portfolio Management accepted these funds without disclosing that it provided no such services to the Global U.S. Subsidiaries. On information

and belief, those proceeds, procured by fraud, were laundered to Huddleston or one of his associated companies. 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i); 18 U.S.C. § 1957(a). The purpose of laundering the money through CA Portfolio Management was to defraud the United States Bankruptcy Court related to Huddleston's bankruptcy proceedings. 18 U.S.C. § 152.

n. **Racketeering Act 15 (Mail or Wire Fraud, Money Laundering)**: On or about April 25, 2018, Tubeileh caused the Global U.S. Subsidiaries to, under fraudulent pretenses, wire $150,000 to an account controlled by CA Portfolio Management with an understanding that the funds were for consulting fees, which was false. 18 U.S.C. § 1341; 18 U.S.C. § 1343. CA Portfolio Management accepted these funds without disclosing that it provided no such services to the Global U.S. Subsidiaries. 18 U.S.C. § 1341; 18 U.S.C. § 1343. On information and belief, those proceeds, procured by fraud, were laundered to Huddleston or one of his associated companies. 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i); 18 U.S.C. § 1957(a). The purpose of laundering the money through CA Portfolio Management was to defraud the United States Bankruptcy Court related to Huddleston's bankruptcy proceedings. 18 U.S.C. § 152.

o. **Racketeering Act 16 (Mail or Wire Fraud, Money Laundering)**: On or about June 1, 2018, Tubeileh caused the Global U.S. Subsidiaries to, under fraudulent pretenses, wire $175,000 to an account controlled by CA Portfolio Management with an understanding that the funds were for consulting fees, which was false. 18 U.S.C. § 1341; 18 U.S.C. § 1343. CA

Portfolio Management accepted these funds without disclosing that it provided no such services to the Global U.S. Subsidiaries. On information and belief, those proceeds, procured by fraud, were laundered to Huddleston or one of his associated companies. 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i); 18 U.S.C. § 1957(a). The purpose of laundering the money through CA Portfolio Management was to defraud the United States Bankruptcy Court related to Huddleston's bankruptcy proceedings. 18 U.S.C. § 152.

p.  **Racketeering Act 17 (Mail or Wire Fraud, Money Laundering)**: On or about July 31, 2018, Tubeileh caused the Global U.S. Subsidiaries to, under fraudulent pretenses, wire $500,000 to an account controlled by CA Funds Group with an understanding that the funds were for consulting fees, which was false. 18 U.S.C. § 1341; 18 U.S.C. § 1343. CA Fund Group accepted these funds without disclosing that it provided no such services to the Global U.S. Subsidiaries. On information and belief, those proceeds, procured by fraud, were laundered to Huddleston or one of his associated companies. 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i); 18 U.S.C. § 1957(a). The purpose of laundering the money through CA Funds Group was to defraud the United States Bankruptcy Court related to Huddleston's bankruptcy proceedings. 18 U.S.C. § 152.

q.  **Racketeering Act 18 (Mail or Wire Fraud, Money Laundering)**: On or about September 14, 2018, Tubeileh caused the Global U.S. Subsidiaries to, under fraudulent pretenses, wire $150,000 to an account controlled by CA Funds Group with an understanding that the funds were for consulting fees,

which was false. 18 U.S.C. § 1341; 18 U.S.C. § 1343. CA Funds Group accepted these funds without disclosing that it provided no such services to the Global U.S. Subsidiaries. On information and belief, those proceeds, procured by fraud, were transferred to Huddleston or one of his associated companies. 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i); 18 U.S.C. § 1957(a). The purpose of laundering the money through CA Funds Group was to defraud the United States Bankruptcy Court related to Huddleston's bankruptcy proceedings. 18 U.S.C. § 152.

r. **Racketeering Act 19 (Mail or Wire Fraud, Money Laundering):** On or about February 22, 2018, under fraudulent pretenses, Sinostar loaned the Global U.S. Subsidiaries $1,500,000.00 using funds procured by fraud. In this capacity, Sinostar was acting as a "financial institution" under 31 U.S.C. § 5312(a). This loan was fraudulent in its own right because it was based on misinformation about the true relationship between Tubeileh and Sinostar, in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and further constitutes money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i); 18 U.S.C. § 1957(a).

s. **Racketeering Act 20 (Mail or Wire Fraud, Money Laundering):** On or about October 29, 2018, under fraudulent pretenses Sinostar loaned the Global U.S. Subsidiaries $2,000,000.00, using funds procured by fraud. In this capacity, Sinostar was acting as a "financial institution" under 31 U.S.C. § 5312(a). This loan was fraudulent in its own right because it was based on misinformation about the true relationship between Tubeileh and Sinostar, in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and further

constitutes money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i); 18 U.S.C. § 1957(a).

t.  **Racketeering Act 21 (Mail or Wire Fraud, Money Laundering)**: On or about February 12, 2019, as amended, under fraudulent pretenses Sinostar loaned the Global U.S. Subsidiaries $2,500,000.00 using funds procured by fraud. In this capacity, Sinostar was acting as a "financial institution" under 31 U.S.C. § 5312(a). This loan was fraudulent in its own right because it was based on misinformation about the true relationship between Tubeileh and Sinostar, in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and further constitutes money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i); 18 U.S.C. § 1957(a).

u.  **Racketeering Act 22 (Mail or Wire Fraud, Money Laundering)**: On or about February 21, 2020, as amended, under fraudulent pretenses Sinostar loaned the Global U.S. Subsidiaries $2,250,000.00, using funds procured by fraud. In this capacity, Sinostar was acting as a "financial institution" under 31 U.S.C. § 5312(a). This loan was fraudulent in its own right because it was based on misinformation about the true relationship between Tubeileh and Sinostar, in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and further constitutes money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i); 18 U.S.C. § 1957(a).

v.  **Racketeering Act 23 (Mail or Wire Fraud, Money Laundering)**: On or about June 18, 2021, Sinostar loaned the Global U.S. Subsidiaries $1,824,327.00, using funds procured by fraud. In this capacity, Sinostar was acting as a "financial institution" under 31 U.S.C. § 5312(a). This loan was

fraudulent in its own right because it was based on misinformation about the true relationship between Tubeileh and Sinostar, in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and further constitutes money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i); 18 U.S.C. § 1957(a).

w. **Racketeering Acts 24 and 25 (Mail or Wire Fraud, Money Laundering)**: On or about February and March 2023, as amended, under fraudulent pretenses, Sinostar loaned the Global U.S. Subsidiaries a total of $2,266,957.84, using funds procured by fraud. In this capacity, Sinostar was acting as a "financial institution" under 31 U.S.C. § 5312(a). This loan was fraudulent in its own right because it was based on misinformation about the true relationship between Tubeileh and Sinostar, in violation of 18 U.S.C. §§ 1341, 18 U.S.C. § 1343 and further constitutes money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i); 18 U.S.C. § 1957(a).

x. **Racketeering Acts 26 and 27 (Mail or Wire Fraud, Money Laundering)**: On or about February and March 2023, as amended, under fraudulent pretenses, Sinostar loaned the Global U.S. Subsidiaries a total of $2,266,957.84, using funds procured by fraud. In this capacity, Sinostar was acting as a "financial institution" under 31 U.S.C. § 5312(a). This loan was fraudulent in its own right because it was based on misinformation about the true relationship between Tubeileh and Sinostar, in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and further constitutes money laundering,

in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i); 18 U.S.C. § 1957(a).

y.  **Racketeering Acts 28 through 72 (Mail or Wire Fraud):** Each and every transfer of funds from the Global U.S. Subsidiaries to Tubeileh for his purported ORRIs related to the Blackhorn project under the Blackhorn PSA—from April 2021 through May 2023—was fraudulent, as the Blackhorn PSA was procured by fraud and rested on the fraudulent premise that Tubeileh had any ownership interest in the ORRIs. Each and every transfer of funds was effectuated through the means of mail or wire in interstate or foreign commerce, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

z.  **Racketeering Acts 73 through 117 (Mail or Wire Fraud**): Each and every transfer of Carried Working Interest to Huddleston related to the Blackhorn project—from April 2021 through May 2023—was procured by fraud or fraudulent pretenses from the Global U.S. Subsidiaries, and effectuated through the means of mail or wire in interstate or foreign commerce, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

aa. **Racketeering Acts 118 through 162 (Mail or Wire Fraud**): Each and every transfer of Carried Working Interest to Tubeileh related to the Blackhorn project—from April 2021 through May 2023—was procured by fraud or fraudulent pretenses from the Global U.S. Subsidiaries, and effectuated through the means of wire in interstate or foreign commerce, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

bb. **Racketeering Acts 163 through 167 (Mail or Wire Fraud)**: Each and every commission payment to Tubeileh related to the Commissions Scheme or otherwise discussed was procured by fraud or fraudulent pretenses from the Global U.S. Subsidiaries, and effectuated through the means of wire in interstate or foreign commerce, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

cc. **Racketeering Acts 168 through 174 (Mail or Wire Fraud)**: Each and every commission payment to Huddleston, Louisiana Offshore, or BDHL related to the Commissions Scheme or otherwise discussed was procured by fraud or fraudulent pretenses from the Global U.S. Subsidiaries, and effectuated through the means of wire in interstate or foreign commerce, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

dd. **Racketeering Act 169 (Mail or Wire Fraud, Fraud on the United States):** Tubeileh, in executing his 2019 employment agreement, which was procured by fraud, unlawfully and knowingly and applied for procured an E-2 Work Visa using documents and other evidence contrary to law. 18 U.S.C. § 1343; 18 U.S.C. § 1425(a).

406.    As discussed above, as a direct and proximate result of Tubeileh's racketeering activities and violations of 18 U.S.C. § 1962(c), the Plaintiffs have been injured in their business and property and are entitled to damages from Tubeileh.

## COUNT 2
### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### 18 U.S.C. § 1962(C)
### (AGAINST TUBEILEH, SINOSTAR, JAMALABOX, AND BARNETT)

407.    Plaintiffs incorporate the above allegations by reference as if fully rewritten here.

408.    This claim arises under Title 18, United States Code Section 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity … ."

409.    At all relevant times, Tubeileh was a "person" within the meaning of Title 18, United States Code Section 1961(3), as he was "capable of holding a legal or beneficial interest in property."

410.    At all relevant times, Barnett was a "person" within the meaning of Title 18, United States Code Section 1961(3), as he was "capable of holding a legal or beneficial interest in property."

411.    At all relevant times, Jamalabox was a "person" within the meaning of Title 18, United States Code Section 1961(3), as it was "capable of holding a legal or beneficial interest in property."

412.    At all relevant times, Sinostar was a "person" within the meaning of Title 18, United States Code Section 1961(3), as it was "capable of holding a legal or beneficial interest in property."

413.    At all relevant times, Tubeileh, Barnett, Sinostar, and Jamalabox were an "association-in-fact enterprise" (the "AIF Enterprise").

414.    Tubeileh's, Barnett's, Sinostar's, and Jamalabox's predicate acts of racketeering within the meaning of Title 18, United States Code Section 1961(1) include, but are not limited to the racketeering acts discussed above (*see supra* ¶¶ 405a–l, 405r–x), which are incorporated here by reference.

415.    As discussed above, as a direct and proximate result of Tubeileh's, Barnett's, Sinostar's, and Jamalabox's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs

have been injured in their business and property and entitled to damages from Tubeileh, Barnett, Sinostar, and Jamalabox, jointly and severally.

**COUNT 3**
**RICO CONSPIRACY**
**18 U.S.C. § 1962(D)**
**(AGAINST HUDDLESTON, BDHL, AND LOUISIANA OFFSHORE)**

416.   Plaintiffs incorporate the above allegations by reference as if fully rewritten here.

417.   This claim alleges a violation of Title 18, United States Code Section 1962(d), which makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [18 U.S.C. § 1962]."

418.   Huddleston—and alter ego his companies Louisiana Offshore or BDHL— conspired with Tubeileh (Count I) or Tubeileh, Barnett, Jamalabox, and Sinostar (Count II) to violate 18 U.S.C. §§ 1962(a) and (c), as described herein.

419.   Louisiana Offshore is wholly controlled by Huddleston and is his alter ego.

420.   BDHL is wholly controlled by Huddleston and is his alter ego.

421.   Huddleston—and his alter ego companies Louisiana Offshore or BDHL—has participated as a co-conspirator with Tubeileh (Count I) or Tubeileh, Barnett, Jamalabox, and Sinostar (Count II) and has performed those acts in furtherance of the conspiracy.

422.   Huddleston—and his alter ego companies Louisiana Offshore or BDHL—and Tubeileh (Count I) or Tubeileh, Barnett, Jamalabox, and Sinostar (Count II) agreed, whether expressly or tacitly, that some person would commit at least two of the predicate acts set forth above (*see supra* ¶¶ 405m–q, 405z, 405cc) in the course of participating in the affairs or operations of the Global Enterprise or AIF Enterprise, in violation of 18 U.S.C. § 1962(c).

423.   Huddleston—and his alter ego companies Louisiana Offshore or BDHL—and Tubeileh (Count I) or Tubeileh, Barnett, Jamalabox, and Sinostar (Count II) agreed, whether

88

expressly or tacitly, that some person would commit at least two of the predicate acts set forth above in the course of using the proceeds of the conduct alleged above to use the profits of the Commission Scheme and the Carried Working Interest Scheme, in violation of 18 U.S.C. § 1962(a).

424.    Huddleston—and his alter ego companies Louisiana Offshore or BDHL—was aware of the essential scope and nature of, and intended to participate in, the Carried Working Interest Scheme and the Commission Scheme to corruptly operate the Global Enterprise or the AIF Enterprise to the benefit of Tubeileh (Count I) or Tubeileh, Barnett, Jamalabox, and Sinostar (Count II) and to use the proceeds of the conduct alleged to further invest in the Carried Working Interest Scheme and the Commission Scheme.

425.    There was no plausible lawful rationale for the manner in which Huddleston—and his alter ego companies Louisiana Offshore or BDHL—and his co-conspirators participated in the affairs of the Carried Working Interest Scheme and the Commission Scheme and the proceeds of the conduct alleged above to further those schemes.

426.    As discussed above, Plaintiffs have been injured in their business and property as a direct and proximate result of the unlawful agreement between Huddleston—and his alter ego companies Louisiana Offshore or BDHL—and the Global Enterprise or the AIF Enterprise.

## COUNT 4
## RICO CONSPIRACY
## 18 U.S.C. § 1962(D)
### (AGAINST DETLEF MADER)

427.    Plaintiffs incorporate the above allegations by reference as if fully rewritten here.

428.    This claim alleges a violation of Title 18, United States Code Section 1962(d), which makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [18 U.S.C. § 1962]."

429.     Mader conspired with Tubeileh (Count I) or Tubeileh, Barnett, Jamalabox, and Sinostar (Count II) to violate 18 U.S.C. § 1962(a) and (c), as described herein.

430.     Mader has participated as a co-conspirator with Tubeileh (Count I) or Tubeileh, Barnett, Jamalabox, and Sinostar (Count II) in the above-listed offenses (*see supra* ¶¶ 405a–dd) and has performed those acts in furtherance of the conspiracy.

431.     Mader and Tubeileh (Count I) or Tubeileh, Barnett, Jamalabox, and Sinostar (Count II) agreed, whether expressly or tacitly, that some person would commit at least two of the predicate acts set forth above in the course of participating in the affairs or operations of the Global Enterprise or AIF Enterprise, in violation of 18 U.S.C. § 1962(c).

432.     Mader and Tubeileh (Count I) or Tubeileh, Barnett, Jamalabox, and Sinostar (Count II) agreed, whether expressly or tacitly, that some person would commit at least two of the predicate acts set forth above in the course of using the proceeds of the conduct alleged above to use the profits of the Sham Advisory Fee Scheme, Self-Dealing Loan Scheme, the Commissions Scheme, the Immigration Fraud Scheme, and the Overriding Royalty Interest Scheme, in violation of 18 U.S.C. § 1962(a).

433.     Mader was aware of the essential scope and nature of and intended to participate in the Sham Advisory Fee Scheme, Self-Dealing Loan Scheme, the Commissions Scheme, the Immigration Fraud Scheme, and the Overriding Royalty Interest Scheme to corruptly operate the Global Enterprise to the benefit of Tubeileh (Count I) or Tubeileh, Barnett, Jamalabox, and Sinostar (Count II) and to use the proceeds of the conduct alleged to further invest in those schemes.

434.     There was no plausible lawful rationale for the manner in which Mader and his co-conspirators participated in the affairs of the Sham Advisory Fee Scheme, Self-Dealing Loan

Scheme, the Commissions Scheme, the Immigration Fraud Scheme, and the Overriding Royalty Interest Scheme or used the proceeds of the conduct alleged above to invest in the schemes.

435.     As discussed above, Plaintiffs have been injured in their business and property as a direct and proximate result of the unlawful agreement between Mader and the Global Enterprise or the AIF Enterprise.

**COUNT 5**
**RICO CONSPIRACY**
**18 U.S.C. § 1962(D)**
**(AGAINST JOHN BARNETT)**

436.     Plaintiffs incorporate the above allegations by reference as if fully rewritten here.

437.     This claim alleges a violation of Title 18, United States Code Section 1962(d), which makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [18 U.S.C. § 1962]."

438.     Barnett conspired with Tubeileh (Count I) to violate 18 U.S.C. § 1962(a) and (c), as described herein.

439.     Barnett has participated as a co-conspirator with Tubeileh (Count I) in the above-listed offenses (*see supra* ¶¶ 405a–l, 405r–x), and has performed those acts in furtherance of the conspiracy.

440.     Barnett and Tubeileh agreed, whether expressly or tacitly, that some person would commit at least two of the predicate acts set forth above in the course of participating in the affairs or operations of the Global Enterprise, in violation of 18 U.S.C. § 1962(c).

441.     Barnett and Tubeileh agreed, whether expressly or tacitly, that some person would commit at least two of the predicate acts set forth above in the course of using the proceeds of the conduct alleged above to use the profits of the Sham Advisory Fee Scheme and the Self-Dealing Loan Scheme, in violation of 18 U.S.C. § 1962(a).

442.     Barnett was aware of the essential scope and nature of and intended to participate in the Sham Advisory Fee Scheme and the Self-Dealing Loan Scheme to corruptly operate the Global Enterprise to the benefit of Tubeileh and to use the proceeds of the conduct alleged to further invest in the Sham Advisory Fee Scheme and the Self-Dealing Loan Scheme.

443.     There was no plausible lawful rationale for the manner in which Barnett and his co-conspirators participated in the affairs of the Sham Advisory Fee Scheme and the Self-Dealing Loan Scheme or used the proceeds of the conduct alleged above to invest in the Sham Advisory Fee Scheme and the Self-Dealing Loan Scheme.

444.     As discussed above, Plaintiffs have been injured in their business and property as a direct and proximate result of the unlawful agreement between Barnett and the Global Enterprise.

## COUNT 6
## RICO CONSPIRACY
## 18 U.S.C. § 1962(D)
## (AGAINST SINOSTAR)

445.     Plaintiffs incorporate the above allegations by reference as if fully rewritten here.

446.     This claim alleges a violation of Title 18, United States Code Section 1962(d), which makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [18 U.S.C. § 1962]."

447.     Sinostar conspired with Tubeileh (Count I) to violate 18 U.S.C. § 1962(a) and (c), as described herein.

448.     Sinostar has participated as a co-conspirator with Tubeileh in the above-listed offenses (*see supra* ¶¶ 405a–l, 405r–x), and has performed those acts in furtherance of the conspiracy.

449.     Sinostar and Tubeileh agreed, whether expressly or tacitly, that some person would commit at least two of the predicate acts set forth above in the course of participating in the affairs or operations of the Global Enterprise, in violation of 18 U.S.C. § 1962(c).

450.     Sinostar and Tubeileh agreed, whether expressly or tacitly, that some person would commit at least two of the predicate acts set forth above in the course of using the proceeds of the conduct alleged above to use the profits of the Sham Advisory Fee Scheme and the Self-Dealing Loan Scheme, in violation of 18 U.S.C. § 1962(a).

451.     Sinostar was aware of the essential scope and nature of and intended to participate in the Sham Advisory Fee Scheme and the Self-Dealing Loan Scheme to corruptly operate the Global Enterprise to the benefit of Tubeileh and to use the proceeds of the conduct alleged to further invest in the Sham Advisory Fee Scheme and the Self-Dealing Loan Scheme.

452.     There was no plausible lawful rationale for the manner in which Sinostar and its co-conspirators participated in the affairs of the Sham Advisory Fee Scheme and the Self-Dealing Loan Scheme or used the proceeds of the conduct alleged above to invest in the Sham Advisory Fee Scheme and the Self-Dealing Loan Scheme.

453.     As discussed above, Plaintiffs have been injured in their business and property as a direct and proximate result of the unlawful agreement between Sinostar and the Global Enterprise.

**COUNT 7**
**RICO CONSPIRACY**
**18 U.S.C. § 1962(D)**
**(AGAINST JAMALABOX)**

454.     Plaintiffs incorporate the above allegations by reference as if fully rewritten here.

455.     This claim alleges a violation of Title 18, United States Code Section 1962(d), which makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [18 U.S.C. § 1962]."

456.    Jamalabox conspired with Tubeileh (Count I) to violate 18 U.S.C. § 1962(a) and (c), as described herein.

457.    Jamalabox has participated as a co-conspirator with Tubeileh in the above-listed offenses (*see supra* ¶¶ 405a–l, 405r–x) and has performed those acts in furtherance of the conspiracy.

458.    Jamalabox and Tubeileh agreed, whether expressly or tacitly, that some person would commit at least two of the predicate acts set forth above in the course of participating in the affairs or operations of the Global Enterprise, in violation of 18 U.S.C. § 1962(c).

459.    Jamalabox and Tubeileh agreed, whether expressly or tacitly, that some person would commit at least two of the predicate acts set forth above in the course of using the proceeds of the conduct alleged above to use the profits of the Sham Advisory Fee Scheme and the Self-Dealing Loan Scheme, in violation of 18 U.S.C. § 1962(a).

460.    Jamalabox was aware of the essential scope and nature of and intended to participate in the Sham Advisory Fee Scheme and the Self-Dealing Loan Scheme to corruptly operate the Global Enterprise to the benefit of Tubeileh and to use the proceeds of the conduct alleged to further invest in the Sham Advisory Fee Scheme and the Self-Dealing Loan Scheme.

461.    There was no plausible lawful rationale for the manner in which Jamalabox and its co-conspirators participated in the affairs of the Sham Advisory Fee Scheme and the Self-Dealing Loan Scheme or used the proceeds of the conduct alleged above to invest in the Sham Advisory Fee Scheme and the Self-Dealing Loan Scheme.

462.    As discussed above, Plaintiffs have been injured in their business and property as a direct and proximate result of the unlawful agreement between Jamalabox and the Global Enterprise.

**COUNT 8**
**RICO CONSPIRACY**
**18 U.S.C. § 1962(D)**
**(AGAINST CA PORTFOLIO MANAGEMENT AND CA FUNDS GROUP)**

463.    Plaintiffs incorporate the above allegations by reference as if fully rewritten here.

464.    This claim alleges a violation of Title 18, United States Code Section 1962(d), which makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [18 U.S.C. § 1962]."

465.    CA Portfolio Management and CA Funds Group conspired with Tubeileh (Count I) or Tubeileh, Barnett, Jamalabox, and Sinostar (Count II) to violate 18 U.S.C. § 1962(a) and (c), as described herein.

466.    CA Portfolio Management and CA Funds Group have participated as co-conspirators with Tubeileh in the above-listed offenses (*see supra* ¶¶ 405m–q) and have performed those acts in furtherance of the conspiracy.

467.    CA Portfolio Management, CA Funds Group, and Tubeileh (Count I) or Tubeileh, Barnett, Jamalabox, and Sinostar (Count II) agreed, whether expressly or tacitly, that some person would commit at least two of the predicate acts set forth above in the course of participating in the affairs or operations of the Global Enterprise or the AIF Enterprise, in violation of 18 U.S.C. § 1962(c).

468.    CA Portfolio Management, CA Funds Group, and Tubeileh (Count I) or Tubeileh, Barnett, Jamalabox, and Sinostar (Count II) agreed, whether expressly or tacitly, that some person would commit at least two of the predicate acts set forth above in the course of using the proceeds of the conduct alleged above to use the profits of the Sham Advisory Fee Scheme, in violation of 18 U.S.C. § 1962(a).

469.    CA Portfolio Management and CA Funds Group were aware of the essential scope and nature of and intended to participate in the Sham Advisory Fee Scheme to corruptly operate the Global Enterprise to the benefit of Tubeileh, Sinostar, Jamalabox, or Huddleston and to use the proceeds of the conduct alleged to further invest in the Sham Advisory Fee Scheme.

470.    There was no plausible lawful rationale for the manner in which CA Portfolio Management, CA Funds Group, and their co-conspirators participated in the affairs of the Sham Advisory Fee Scheme or used the proceeds of the conduct alleged above to invest in the Sham Advisory Fee Scheme.

471.    As discussed above, Plaintiffs have been injured in their business and property as a direct and proximate result of the unlawful agreement between CA Portfolio Management, CA Funds Group, and the Global Enterprise or the or the AIF Enterprise.

## COUNT 9
### BREACH OF FIDUCIARY DUTY
### (AGAINST BLACKHORN USA AND BLACKHORN GROUP)

472.    Plaintiffs incorporate the above allegations by reference as if fully rewritten here.

473.    Blackhorn USA and Blackhorn Group (together here, "Blackhorn") served and continues to serve as the operator of oil and gas wells in which the Global U.S. Subsidiaries owned (and still own) a working interest.

474.    With respect to such wells, Blackhorn and the Global U.S. Subsidiaries were engaged in a joint venture relationship.

475.    As a participant in the joint venture with the Global U.S. Subsidiaries, Blackhorn owed Global Oklahoma and Global Texas fiduciary duties as a matter of law.

476.    Blackhorn breached its fiduciary duties to the Global U.S. Subsidiaries.

477.    Blackhorn's breach of its fiduciary duties resulted in substantial damages to the Global U.S. Subsidiaries.

478.    Plaintiffs are therefore entitled to recover damages from Blackhorn, in an amount to be proven at trial.

**COUNT 10**
**FRAUD**
**(AGAINST JAMALABOX, HUDDLESTON, BDHL, LOUISIANA OFFSHORE, CA PORTFOLIO MANAGEMENT, CA FUNDS GROUP)**

479.    Plaintiffs incorporate the above allegations reference as if fully rewritten here.

480.    For purposes of Count 10, Defendants include Jamalabox, Huddleston and his alter-ego companies BDHL and Louisiana Offshore, CA Portfolio Management, and CA Funds Group.

481.    Each Defendant made independent and material representations to, or omitted material information from, the Global U.S. Subsidiaries related to various transactions involving Defendants and the Global U.S. Subsidiaries:

> a.    Jamalabox: *see* ¶¶ 61, 63, 69–71, 77–79, 91–93, 95–100, 104–06, 109, 113–14, 119–20, 123–24, 129–30, 132–35, and 160;

> b.    Huddleston/BDHL/Louisiana Offshore: *see* ¶¶ 80–82, 87–90, 183, 229–48, and 310–26;

> c.    CA Portfolio Management or CA Funds Group: *see* ¶¶ 72–73, 91–103, 107–08, 115–16, and 125–28.

482.    At the time these Defendants made these statements or omissions, each knew the statement was false or it was made with such recklessness that the speaker should have known it was false.

483.    Each statement was made with the intent to induce the Global U.S. Subsidiaries into relying on said statement, the Global U.S. Subsidiaries so relied, and were injured as a proximate result of the misstatements or omissions.

484.     Plaintiffs are therefore entitled to recover damages from these Defendants in amounts to be proven at trial.

## COUNT 11
### AIDING AND ABETTING FRAUD
### (AGAINST CHRIS CHRISTENSON AND JOHN BARNETT)

485.     Plaintiffs incorporate the above allegations by reference as if fully rewritten here.

486.     Defendants Jamalabox, Huddleston and his alter-ego companies BDHL and Louisiana Offshore, CA Portfolio Management, and CA Funds Group (for Count 11, the "Primary Defendants") committed fraud.

487.     Defendants John Barnett and Chris Christenson (for Count 11, the "Secondary Defendants") had knowledge that the Primary Defendants' conduct constituted a tort.

488.     The Secondary Defendants intended to assist the various other Primary Defendants in the commission of the fraud discussed above in Count 10.

489.     The Secondary Defendants did give the Primary Defendants assistance or encouragement in committing the fraud discussed above in Count 10.

490.     The Secondary Defendants conduct, assistance, and encouragement was a substantial factor in causing the fraud discussed above in Count 10.

491.     The Secondary Defendants have therefore aided and abetted the fraud discussed in Count 10 and are jointly and severally liable for the same, in an amount to be proven at trial.

## COUNT 12
### UNJUST ENRICHMENT

492.     Plaintiffs incorporate the above allegations by reference as if fully rewritten here.

493.     For purposes of Count 12, Defendants include Jamalabox, Barnett, Mader, Huddleston, BDHL, Louisiana Offshore, CA Portfolio Management, CA Funds Group, and Chris Christenson.

494.     As a result of Defendants' conduct, the Global U.S. Subsidiaries conferred benefits on all Defendants, who knowingly received and retained these benefits.

495.     Defendants wrongly secured these benefits at the expense of the Global U.S. Subsidiaries through various iterations of fraud, deception, duress, and/or undue advantage over the Global U.S. Subsidiaries, as discussed above.

496.     Under the circumstances, Defendants' retention of these benefits would be unjust, inequitable, and unconscionable.

497.     Defendants' conduct and actions set forth above constitute unjust enrichment under the common law of Texas.

498.     Plaintiffs are entitled to damages as a result, in an amount to be proven at trial.

## COUNT 13
### TEXAS THEFT LIABILITY ACT

499.     Plaintiffs incorporate the above allegations by reference as if fully rewritten here.

500.     For Count 13, Defendants include Tubeileh, Huddleston, Jamalabox, Sinostar, BDHL, Louisiana Offshore, CA Portfolio Management, and CA Funds Group.

501.     Plaintiffs had a possessory right to the monies and property that were wrongfully taken from Plaintiffs by Defendants. *See, e.g.*, *supra*, ¶ 54–148, 228–248, 269–326.

502.     Defendants' unlawful appropriation of such funds and property, without Plaintiffs' knowledge or consent, constitutes theft within the meaning of Section 134.002 of the Texas Civil Practice and Remedies Code and Section 31.03 of the Texas Penal Code.

503.     Defendants' theft was made with the intent to deprive Plaintiffs of their funds and property and use it for Defendants' personal gain.

504.     As a result of Defendants' wrongful acts, Plaintiffs suffered damages and are entitled to recover actual damages resulting from Defendants' theft, as well as statutory damages

to the full extent provided by Section 134.005(a)(1) of the Texas Civil Practice and Remedies Code.

505.    Plaintiffs are also entitled to reasonable attorneys' fees and court costs under Section 134.005(b) of the Texas Civil Practice and Remedies Code.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs pray for the following remedies:

a.    Monetary damages, according to proof, including compensatory damages, lost interest, lost profits, and incidental and consequential damages, jointly and severally from each defendant as permitted by law;

b.    Treble damages as applicable under 18 U.S.C. § 1964(c);

c.    Punitive damages to the extent allowed by law;

d.    Pre-judgment and post-judgment interest;

e.    Attorney's fees and costs of suit under 18 U.S.C. § 1964(c), or as otherwise permitted by law; and

f.    Any other legal or equitable remedy the Court deems just and appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable. *See* Fed. R. Civ. P. 38(b).

Respectfully submitted,

s/ *Richard B. Roper*

**HOLLAND & KNIGHT**
Richard B. Roper (TX Bar # 17233700)
Meghan McCaig (TX Bar # 24070083)
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, TX 75201
Telephone:   214.964.9500
Facsimile:   214.964.9501
Email:       richard.roper@hklaw.com
Email:       meghan.mccaig@hklaw.com

and

**TUCKER ELLIS LLP**
Marc R. Greenberg (*pro hac vice* forthcoming)
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071
Telephone:   213.430.3400
Facsimile:   213.430.3409
Email:       marc.greenberg@tuckerellis.com

*Attorneys for Plaintiffs Global Oil & Gas Texas,*
*LLC and Global Oil & Gas Fields, Oklahoma LLC*